[No. B060704. Second Dist., Div. Two. Mar. 19, 1993.]

LONG BEACH LESBIAN AND GAY PRIDE, INC., et al., Plaintiffs and Appellants, v.
CITY OF LONG BEACH, Defendant and Appellant.

314

**Counsel**

William E. Weinberger, Jon W. Davidson, Paul L. Hoffman and Mark D. Rosenbaum for Plaintiffs and Appellants.

Robert L. Walker and Eric Neisser as Amici Curiae on behalf of Plaintiffs and Appellants.

John R. Calhoun, City Attorney, and Michael J. Mais, Deputy City Attorney, for Defendant and Appellant.

## OPINION

**FUKUTO, J.**—These appeals present numerous challenges to the constitutionality of the parade permit ordinance of the City of Long Beach (City), Long Beach Municipal Code Chapter 5.60 (hereafter cited by section and referred to as Chapter 5.60.)[1]. The City, defendant below, appeals from the superior court's judgment insofar as it holds that section 5.60.030(C) of the ordinance imparts unconstitutionally broad administrative discretion over the grant or denial of parade permits, and that since that section cannot be severed from the rest, the ordinance is entirely invalid. In their cross-appeal, plaintiffs, Long Beach Lesbian and Gay Pride, Inc. (LBLGP) and certain of its taxpayer-members, challenge the judgment's further declaration that numerous other features and provisions of Chapter 5.60—most prominently, those requiring parade permittees to pay for City services and carry insurance—are constitutionally valid. LBLGP also seeks damages from the City on account of charges paid under these provisions.

We hold first that the superior court correctly determined that, as drafted, the ordinance's central provision governing the issuance of permits unconstitutionally grants unrestrained discretion whether to grant or deny them, and that the section cannot be severed from the rest of the ordinance, which therefore is unconstitutional. After explaining why this holding does not moot plaintiffs' further contentions, we hold that except for the insurance requirement and the provisions for the timing of permit applications, the other challenged aspects of Chapter 5.60 are valid.

### I.

### THE FACTS

LBLGP is a nonprofit corporation devoted to producing an annual parade and "festival."[2] The parade commemorates the lesbian and gay rights movement, publicly espouses such rights, and celebrates the participants' pride in their orientation while allowing them to enlighten the community about it. LBLGP has conducted the parade annually since 1984, on Sunday afternoons in May or June, along a 1.6-mile stretch of Ocean Boulevard, a main

[1] The complete text of Chapter 5.60 is attached as an appendix.
[2] The festival and *its* regulation are not directly at issue in this case.

thoroughfare of the City. The parade includes both pedestrians and motor vehicles, some pulling floats; between 1984 and 1989 the approximate number of participants grew from 300 to 1,000.

For each parade, LBLGP has been subject to the permit requirements of Chapter 5.60, or a predecessor chapter with similar provisions. Chapter 5.60 prohibits the conduct in the City of any parade, as defined in section 5.60.010(D), without first procuring a permit from the city manager or his designee. (§ 5.60.020(A).) The permit requirement also applies to defined "filming activity" and "local special events." (§§ 5.60.010(B), (C), 5.60.020(A).) An exception is made for events specially licensed by the city council. (§ 5.60.020(A).)

A permit applicant must file an application with the city manager, at least 30 working days before the event in the case of parades (3 days and 10 days, respectively, for filmings and block parties). (§ 5.60.030(A).) The city manager may issue the permit upon making certain findings (§ 5.60.030(C)), and may deny or revoke it for specified reasons (§ 5.60.060). Each permit includes an agreement by the permittee to defend, indemnify, and hold harmless the City against losses and liabilities incurred from the conduct of the permittee or its agents. (§ 5.60.070(A).) In addition, the permittee must procure a liability insurance policy covering the City and its agents, in amounts the city manager determines. (§ 5.60.070(B).) The city manager may waive this requirement if the event does not present a substantial liability exposure. (§ 5.60.070(C).) Finally, the permittee must pay the City for all actual costs ("departmental service charges") it incurs in connection with the event, as well as the cost of any City property damaged or destroyed "by reason of" the event. (§§ 5.60.010(A), 5.60.080(A).) A cash deposit for the estimated departmental service charges must be provided at least three days before the event. (§ 5.60.080(C).) Violation of the chapter is a misdemeanor. (§ 5.60.120.)

Between 1984 and 1989, in compliance with the chapter's requirements, LBLGP annually paid the City sums for departmental service charges ranging from about $5,600 to about $18,600. Although in most instances these amounts represented unsegregated totals attributable to the parade and the contemporaneous festival, the parade's charges for 1989 ran $12,537.40. In addition, LBLGP paid premiums, for the $1 million insurance coverage the City required for both events, ranging from $910 in 1984 to $11,430 in 1985.

Plaintiffs commenced this action in 1985. In 1986, LBLGP was unable to find an insurer willing to provide it coverage, and the City refused to waive

or reduce that requirement. Just days before the May 1986 parade, plaintiffs obtained a preliminary injunction restraining the City from requiring insurance for it. In succeeding years after 1987, LBLGP did obtain insurance.

The matter proceeded to trial in 1990 and 1991. At the conclusion, the court rendered judgment declaring that Chapter 5.60 was void because the discretionary permit approval provision of section 5.60.030(C) violated the First Amendment to the United States Constitution and article I, section 2 of the California Constitution, and could not be severed from the rest of the chapter. However, the court further declared that the remaining challenged sections of Chapter 5.60 were not unconstitutional, facially or as applied. The judgment also denied recovery of LBLGP's insurance premiums and departmental service charges, except for $782.72 LBLGP had been charged in 1989 for removal of graffiti for which it was not responsible.

## II.

### THE CITY'S APPEAL

The City's appeal contests both prongs of the trial court's holding that Chapter 5.60 is unconstitutional: first, that section 5.60.030(C), governing the granting of parade permits, violates the First Amendment, and second, that if thus unconstitutional the section cannot be severed from the rest of the chapter, resulting in its total invalidity.[3] We shall conclude that the trial court was correct in both respects.

Certain basic, settled principles frame resolution of the initial constitutional issue, and also underlie consideration of plaintiffs' further constitutional claims. ■ Parades such as LBLGP's, although not consisting entirely of "pure speech," do constitute activity squarely within the protection of the First Amendment's guarantees of freedom of speech and assembly. (*Shuttlesworth* v. *Birmingham* (1969) 394 U.S. 147, 152 [22 L.Ed.2d 162, 168, 89 S.Ct. 935] [hereafter *Shuttlesworth*].) In the words of a recent United States Supreme Court decision, this means that "[t]he [Long Beach] ordinance requiring a permit and a fee before authorizing . . . parades, or assemblies in 'the archetype of a traditional public forum' [citation], is a prior restraint on speech. [Citations.] Although there is a 'heavy presumption' against the validity of a prior restraint [citations], the Court has

---

[3]We use the term "First Amendment" to refer to both that provision of the United States Constitution and the parallel California constitutional provisions upon which plaintiffs also rely (Cal. Const., art. I, §§ 2, 3). Although, as plaintiffs note, the California provisions have been said to afford even greater rights than the federal (e.g., *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341]), we do not perceive in the issues or in plaintiffs' arguments any necessity to distinguish between them.

recognized that government, in order to regulate competing uses of public forums, may impose a permit requirement on those wishing to hold a march, parade, or rally. [Citation.] Such a scheme, however, must meet certain constitutional requirements. It may not delegate overly broad licensing discretion to a government official. Further, any permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." (*Forsyth County* v. *Nationalist Movement* (1992) 505 U.S. __, __ [120 L.Ed.2d 101, 111, 112 S.Ct. 2395] [hereafter *Forsyth County*].)

Perhaps the most fundamental and frequently invoked of these requirements is that permit laws must not confide overly vague, overly broad, or, a fortiori, unlimited discretion to officials entrusted with the grant or denial of permits. (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 111]; *Shuttlesworth, supra,* 394 U.S. at p. 153 [22 L.Ed.2d at pp. 168-169]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 866-869 [94 Cal.Rptr. 777, 484 P.2d 945] [hereafter *Dillon*].) Without precise governing standards, an administrator may freely pick and choose among the constitutionally protected events to be allowed. "The First Amendment prohibits the vesting of such unbridled discretion in a government official." (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 113], fn. omitted.)

█ The trial court found section 5.60.030(C) to be unconstitutional under the foregoing principles. Section 5.60.030(C) sets forth a number of criteria that must be satisfied before a permit may issue. The criteria pertain chiefly to traffic hazards; their particular validity is not at issue at this point, although it will be on plaintiffs' appeal. However, the section initially provides as follows: "The city manager or his designee *may* issue a permit under this chapter if it is determined that the following criteria have been met: . . . ." (Italics added.) The trial court ruled that the section, "by using the word *may* as opposed to shall or some other imperative, grants the City Manager or his designee unbridled discretion to deny or reject a special events application even if all the criteria set forth in th[e] Section have been met." Because the remainder of Chapter 5.60 imposed no further limit on this discretion, the court held that section 5.60.030(C) could not stand.

The court's ruling finds ample support in, among other authorities, *Dillon, supra,* 4 Cal.3d 860. There, the court confronted an ordinance which provided in part that " 'Parades and/or civic demonstrations which obstruct the free use of the public streets and/or sidewalks may be permitted provided the following conditions are met: [list of conditions including presentation of

326

application, police department approval, and payment for "extra police officers and/or firemen" if required].' " (*Id.* at p. 863, fn. 2.) The court struck down this ordinance because it allowed unbounded licensing discretion, in two ways. "The . . . ordinance is not only devoid of all standards but, to make matters worse, contains no guarantee that a permit will issue even if the application meets all of the five conditions of the section. . . . Assuming the conditions are met, the section states only that parades and demonstrations '*may* be permitted.' (Italics added.) [¶] In short, the section is a barefaced example of uncontrolled discretion." (*Id.* at p. 870.)

The City attempts to distinguish section 5.60.030(C) in light of another section, section 5.60.060, which provides that a permit may be denied or revoked if the application contains any false statements or the applicant has not otherwise complied with Chapter 5.60 or has violated any other law or regulation. From this framework the City concludes that section 5.60.030(C) must be read as requiring that the permit *shall* be granted if the section's traffic-related criteria are met and no grounds for denial under section 5.60.060 appear. In support of this reading, the City quotes the city manager's testimony that he would so construe the section.

These arguments are unavailing. In *Dillon, supra,* 4 Cal.3d 860, the Supreme Court rejected a similar argument that the ordinance should be read as imposing "a ministerial duty of issuing a permit upon determination of the suitability of the time, place and manner of the proposed activity." (*Id.* at p. 871.) The court was unwilling to disregard the plain meaning of the enactment's permissive language: "As shown above, the ordinance provides that a permit *may* be issued if the conditions of subdivision (b) are met. The ordinance does not provide that a permit *must* issue if the time, place and manner are suitable." (*Ibid.*)

Furthermore, in the present case the city manager's testimony about the proper construction of section 5.60.030(C) did not refer to section 5.60.060, and it was impeached by his pretrial deposition testimony that "since it [§ 5.60.030(C)] doesn't say that the city manager shall issue a permit, I presume that it is intended that it be discretionary with the city manager."

Faced with this ambivalence by the official charged with enforcing the section, we cannot depart from its plain language, or from the Supreme Court's treatment of similar language in *Dillon, supra.* Notwithstanding its internal guidelines, section 5.60.030(C) ultimately reposes in the city manager open-ended discretion whether or not to issue permits. It therefore was correctly held unconstitutional.

The remaining issue on the City's appeal is whether, contrary to the trial court's holding, section 5.60.030(C) may be severed from the rest of Chapter 5.60. The City urges severance is appropriate, because the Long Beach Municipal Code contains a general severability provision, and because, as the City sees it, Chapter 5.60's definitions and provisions for insurance and for payment and refund of departmental service charges (§§ 5.60.010, 5.60.070-5.60.090) are physically capable of severance, and would readily have been enacted even without the permit provision of section 5.60.030(C).

We cannot agree. The City is correct that severability of an unconstitutional portion of a statute requires the mechanical qualification of verbal separability, and, ultimately a judgment whether the enacting body would have enacted the remaining portions without the invalid one. (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330-331 [118 Cal.Rptr. 637, 530 P.2d 605].) But the portions of the chapter which the City seeks to save do not pass these tests. The insurance and departmental service charges provisions all are addressed in terms to the holder of a permit, granted under and in accordance with section 5.60.030(C). With the pivotal permit-granting function unconstitutionally structured, these sections have no verbal anchor or basis. Conversely, even assuming the City manifestly wished to enjoy the benefits of insurance coverage and departmental service charge reimbursement by those who parade within it, such regulation cannot be reconstructed over the invalidity of the licensing provision upon which it is based.

In short, the trial court's invalidation of section 5.60.030(C) has removed the hub from Chapter 5.60's wheel, and without it the spokes cannot stand. In these circumstances of verbal and functional inseverability, the City's general severability clause cannot save the ordinance. (*Santa Barbara Sch. Dist.* v. *Superior Court, supra*, 13 Cal.3d at p. 331.) We must affirm the trial court's judgment that Chapter 5.60 is invalid, together with and by dint of section 5.60.030(C).

### III.

#### PLAINTIFFS' APPEAL

#### 1. *Mootness.*

Plaintiffs' appeal challenges the trial court's declaration that various other sections of Chapter 5.60 do not violate the First Amendment. Our conclusion that the trial court properly held section 5.60 invalid as a whole

raises a threshold issue of whether it is necessary or proper to address these contentions. The issue involves an intersection of the doctrines of mootness, judicial restraint, and advisory opinions.

In one sense, plaintiffs' further challenges to Chapter 5.60 could be considered moot, because plaintiffs have already received an adjudication that the entire ordinance is invalid. Under this practical view, to opine further concerning the intrinsic validity of some of the sections that have been swept away could be characterized as an impermissible advisory opinion (see *Younger* v. *Superior Court* (1978) 21 Cal.3d 102, 119-120 [145 Cal.Rptr. 674, 577 P.2d 1014]), and certainly at variance with the venerable doctrine that constitutional questions should not be decided unless absolutely necessary (see *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]).

However, plaintiffs' appeal is not truly moot. Plaintiffs seek reversal of so much of the judgment as has actually, adversely decided portions of their case. These include tangible claims for damages based on the alleged unconstitutionality of sections 5.60.070-5.60.080. Moreover, were we to dismiss the appeal without disturbing the declaratory portions of the judgment adverse to plaintiffs, plaintiffs would be bound by them without having received appellate review. That posture could be more than theoretically uncomfortable, because if the City on remand were to reenact Chapter 5.60 after changing "may" in section 5.60.030(C) to "shall," plaintiffs could be precluded by collateral estoppel from further pressing their alternative challenges to the ordinance. (Cf. *Viejo Bancorp, Inc.* v. *Wood* (1989) 217 Cal.App.3d 200, 205-206 [265 Cal.Rptr. 620] [dismissal for mootness refused where issue decided by ruling that had expired would bar its relitigation in another action pending between the parties].)

Any offense against the rules precluding advisory opinions or premature constitutional adjudication has thus already been worked, by the very judgment under review. Although we could restore the adjudicative status quo ante by reversing the remaining portions of the declaratory judgment on this ground (cf. Code Civ. Proc., § 1061), that would force the parties to begin anew expensive litigation should Chapter 5.60 be reenacted. We believe the more appropriate alternative is to resolve plaintiffs' fully briefed contentions now. Even assuming they could be considered presently moot, they present questions of public interest which are likely to recur, indeed between these very parties. (See *Downtown Palo Alto Com. for Fair Assessment* v. *City Council* (1986) 180 Cal.App.3d 384, 391-392 [225 Cal.Rptr. 559]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 526, pp. 509-513.) We proceed to the merits of plaintiffs' appeal.

## 2. *Vagueness.*

Plaintiffs contend that two aspects of Chapter 5.60 are unconstitutionally vague and indefinite: the definition of "parades" that requires a permit application (§ 5.60.10(D)), and the criteria by which the city manager is to determine whether a permit may be granted (§ 5.60.030(C)).

These issues invoke two separate but similar constitutional precepts: the due process requirement (U.S. Const., Amends. 5, 14) that statutes, especially penal laws and even more specially those restraining speech, clearly guide what a person must do or forgo (7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, §§ 104-105, pp. 157-159); and the First Amendment's demand that regulations of protected activity incorporate " 'narrowly drawn, reasonable and definite standards.' " (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 113].) We agree with the trial court that the two features of Chapter 5.60 so challenged do not violate these strictures.

Section 5.60.010(D) provides that " 'Parade,' as used in this chapter, means and includes a parade, procession, march, pageant, review, ceremony or exhibition which is conducted in, on, upon, or along any portion of any public street, sidewalk or other property owned or controlled by the city, so as to impede, obstruct, impair or interfere with the free use of such public street, sidewalk or other public property of the city; except . . . funeral processions." There is no room for argument that the list of seven activities at the beginning of the definition is unclear. Nor is the section's limitation to parades that impede, obstruct, or interfere with the free use of streets, sidewalks and facilities impermissibly vague or uninformative. Similar language in penal statutes governing the use of streets has historically been sustained against vagueness challenges. (See *In re Cox* (1970) 3 Cal.3d 205, 221, 223 [90 Cal.Rptr. 24, 474 P.2d 992].)

Plaintiffs' attack on the parade definition rests primarily not on its wording but on claimed inconsistencies in the testimony of various responsible city officials about when the permit requirement would apply. But the alleged inconsistencies which plaintiffs extract do not fairly represent the whole of the witnesses' responses. Fully read, the testimony reflected a coherent, consistent construction of the rules and responsibilities that appear in the text of the provision. Section 5.60.010(D)'s definition of "parade" withstands the vagueness test.

Section 5.60.030(C), as questioned here, provides as preconditions to a permit that the city manager or his designee determine that seven

numbered criteria have been met. Two of these relate only to filming activities and block parties. Another requires determination that the proposed activity is not subject to other permit procedures or governing laws. Yet another is that the "[t]he proposed use, event or activity will not have a significant adverse environmental impact." (Cf. Pub. Resources Code, § 21002.1 [Cal. Environmental Quality Act].) The remaining three criteria parallel but qualify the elements in the definition of "parade": they require that the event will not "unduly" impede, etc., public use of the street, etc., or the operation of emergency vehicles or city services and functions, and that it will not present "a substantial or unwarranted safety or traffic hazard."

Plaintiffs focus their fire on the latter criteria, and particularly on the administrative power or discretion to determine whether the street interference posed is "undue." Plaintiffs liken this standard to the permit law in *Shuttlesworth, supra,* 394 U.S. 147 which allowed a commission to deny a permit if " 'in its judgment the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused.' " (*Id.* at pp. 149-150 [22 L.Ed.2d at pp. 166-167].) But in striking down these standards as too indefinite, the Supreme Court pointedly noted that they were "broad criteria entirely unrelated to legitimate municipal regulation of the public streets and sidewalks." (*Id.* at p. 153 [22 L.Ed.2d at pp. 168-169].) The same cannot be said of the City's criteria under challenge. All of them directly concern street and common area use, congestion, and safety. Moreover, the measures of obstruction, etc., they provide are not beyond common or objective understanding. (*Rutherford* v. *State of California* (1987) 188 Cal.App.3d 1267, 1279 [233 Cal.Rptr. 781].) The standards are not void for uncertainty.

### 3. *Time Limits.*

Plaintiffs make three distinct challenges to aspects of Chapter 5.60 involving time limits for the permit process. For various First Amendment reasons, plaintiffs attack (1) section 5.60.030(A)'s requirement that a parade permit application be filed at least 30 working days prior to the permit's effective date; (2) the same subsection's authorizing a discretionary waiver of that requirement by the city manager or his designee; and (3) the chapter's lack of a specific time limit for decision of the application. We consider these issues in turn.

Section 5.60.030(A) requires 30 working days' advance permit application for parades and for many other events subject to the chapter; however, the

advance time is only 10 days for block parties, and 3 for filming activities. ▮▮ Relying on *N.A.A.C.P., Western Region* v. *City of Richmond* (9th Cir. 1984) 743 F.2d 1346 (hereafter *Richmond*), plaintiffs contend that, particularly in view of the lesser period for other activities, the more than one-month advance application requirements for parades inhibits constitutionally protected activity, both by reducing the degree of spontaneity allowable and by coercing disclosure of plans and intentions, and that these impacts are not sufficiently justified by important governmental purposes.

*Richmond* provides strong support for plaintiffs' position. *Richmond* involved an archetypal conflict with timely speech: because of the city's 20-day permit application requirement and the unavailability of the officials who could waive it, the NAACP faced prohibition of a march, on 5 days' notice, to protest a contemporaneous decision not to investigate a prisoner's death. The *Richmond* court invalidated the 20-day requirement on its face, even though the court discerned a substantial public purpose in parade permit schemes, and also perceived the ordinance as content-neutral. Noting that advance notice requirements inhibit and reduce the quantity of speech, the court observed that many metropolitan parade ordinances required substantially less notice than Richmond's—for example, San Francisco required only 24 hours. (*Richmond, supra*, 743 F.2d at pp. 1356-1357.) The court dismissed the city's undocumented claim that its 20-day period struck a " 'fair balance.' " (*Id.* at p. 1356.)

Long Beach's substantially greater period can fare no better. The City contends that "the scope of the event must be the determinative factor in the actual processing time required." But section 5.60.030(A) is nowise so restricted. And although the City insists that "an event the size and magnitude of the Rose Parade could not be approved in less than thirty days," it has not shown the need to require that much time for plaintiffs' far more diminutive parade, not to mention all parades as defined in section 5.60.010(D). We cannot discern sufficient justification for the blanket 30-day requirement of section 5.60.030(A).

Section 5.60.030(A) also provides that "The city manager or his designee shall have the authority, in his discretion, to consider any application for a permit which is filed later than the time prescribed in this section." Although the City points to this ameliorative allowance as a reason to uphold the 30-day requirement, plaintiffs separately challenge the provision, on grounds it lacks the standards necessary in this First Amendment area.

This challenge too is meritorious. The waiver is the obverse of the otherwise strict advance filing requirement. Whether or not to apply either

must be determined under clear standards; it may not be left to the unguided discretion of an official. (Accord, *Richmond, supra,* 743 F.2d at p. 1357 [invalidating similar provision]; see *Forsyth County, supra,* 505 U.S. at p. ___ [120 L.Ed.2d at pp. 111, 113].) Absent any standards, the provision cannot stand.

 Plaintiffs also contest the failure of Chapter 5.60 to impose time limits upon when the city manager must approve or disapprove a permit application. Plaintiffs argue, with strong support, that in the First Amendment licensing area delay can pragmatically constitute denial. (See *Lakewood* v. *Plain Dealer* (1988) 486 U.S. 750, 771-772 [100 L.Ed.2d 771, 791-793, 108 S.Ct. 2138]; *Freedman* v. *Maryland* (1965) 380 U.S. 51, 58-59 [13 L.Ed.2d 649, 654-655, 85 S.Ct. 734]; *Shuttlesworth, supra,* 394 U.S. at pp. 161-163 [22 L.Ed.2d at pp. 173-175] (conc. opn. of Harlan, J.).)

Although Chapter 5.60 technically does not specify when the permit decision must be made, it implies that this will occur within three days before the permit date: that is when the permittee must pay fees and estimated service charges. (§§ 5.60.040; 5.60.080(C).) But even that construction allows uncertainty until very late. Plaintiffs' primary grievance is with the failure to require a decision within a specific time after the application is made. Plaintiffs do not purport, or ask us, to dictate what a reasonable, acceptable time is. They only complain that to leave the matter open-ended impermissibly places the fate of a parade application in official limbo, both chilling and freezing the applicant's free speech intentions and expectations.

The City has not contested the legal proposition that avoidance of limbo requires a deadline for action following application. We believe the authorities cited above support that requirement. Accordingly, Chapter 5.60's failure to include such an express limit is improper.

### 4. *Permit Revocation.*

Section 5.60.060 provides as follows: "The city manager or his designee may deny any application for a permit or revoke any permit if the city manager or his designee determines that the applicant therefor or holder thereof or any agent, employee or associate of any such applicant or permittee has made any false or misleading statement in an application or has not fully complied with the requirements of this chapter or has violated any of the provisions of this chapter or the provisions of any other applicable law, rule or regulation. *Any permit issued under this chapter may be summarily revoked.*" (Italics added.) Plaintiffs contend that the italicized language provides for standardless discretion to revoke a permit, and therefore

is unconstitutional for the same reasons as are the permit-granting and 30-day waiver provisions of sections 5.60.030(A) and (C).

The premise of plaintiffs' contention is that the second sentence of section 5.60.060 must be read to grant unlimited discretion, "not limited by the criteria stated in the preceding sentence." We do not agree. An at least equally reasonable construction is that the second sentence is meant to expand upon the dynamics of the revocation which the first sentence substantively authorizes. Even if there be some doubt in this regard, we must construe the section to avoid questioning its constitutionality. (*Palermo* v. *Stockton Theatres, Inc., supra,* 32 Cal.2d at p. 60.) So understood and construed, section 5.60.060 does not possess the defect attributed by plaintiffs.[4]

## 5. *Departmental Service Charges.*

Joined by amici curiae, plaintiffs contest on several grounds the constitutionality of section 5.60.080, which requires a parade permittee to reimburse the city for, and pay in advance an estimate of, "all city department[al] service charges incurred in connection with or due to the permittee's activities under the permit." (§ 5.60.080(A).) The section also requires that "[i]f city property is destroyed or damaged by reason of permittee's use, event or activity, the permittee shall reimburse the city for the actual replacement or repair cost of the destroyed or damaged property." (*Ibid.*)

It is beyond dispute that a city is free under the First Amendment to require as a condition to a parade permit that the permittee pay fees to defray the municipal expense of ensuring traffic control and related functions occasioned by the parade. The Supreme Court unanimously so decided in *Cox* v. *New Hampshire* (1941) 312 U.S. 569 [85 L.Ed. 1049, 61 S.Ct. 762, 133 A.L.R. 1396] (hereafter *Cox*). The statute there required a permit for any " 'parade or procession upon any public street or way' " (*id.* at p. 571 [85 L.Ed.2d at p. 1051]), and required the permittee to " 'pay in advance for such license, for the use of the city or town, a sum not more than three hundred dollars for each day . . . .' " (*Id.* at p. 571, fn. 1 [85 L.Ed.2d at p. 1051].)

The court first upheld the permit requirement itself, stating in part, "If a municipality has authority to control the use of its public streets for parades

---

[4]Plaintiffs support their interpretation by noting that the predecessor to section 5.60.060 contained a similar provision for summary revocation, which specified emergency circumstances as authorizing it. The present omission of those grounds does not necessarily mean the procedure is now standardless, as opposed to limited to the grounds stated in the first sentence. As stated, we read the section more naturally to mean the latter.

or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to *time, place and manner* in relation to the other proper uses of the streets." (*Cox, supra,* 312 U.S. at p. 576 [85 L.Ed. at pp. 1053-1054], italics added.) As for the fees, the court noted that under the New Hampshire Supreme Court's construction of the statute, they "had a permissible range from $300 to a nominal amount" (*ibid.*), to be adjusted according to the size and consequent attractiveness of the parade. Furthermore, "[t]he fee was held to be 'not a revenue tax, but one to meet the expense incident to the administration of the Act and to the maintenance of public order in the matter licensed.'" (*Id.* at p. 577 [85 L.Ed. at p. 1054].) To this the court added, "There is nothing contrary to the Constitution in the charge of a fee limited to the purpose stated." (*Ibid.*)[5]

While acknowledging the holdings of *Cox,* plaintiffs submit that its approval of a fee "from $300 to a nominal amount" cannot extend to section 5.60.080's reimbursement requirement for all departmental service charges, which in LBLGP's case have run nearly 50 times higher. Plaintiffs contend that only a "nominal" fee, with a waiver for the truly indigent, can avoid the constitutional pitfall of posing an impermissible obstacle to speech.

This contention must fail. At one point some courts did construe *Cox, supra,* 312 U.S. at page 569, "as authorizing only nominal charges . . . ." (*Cent. Fla. Nuclear Freeze Campaign* v. *Walsh* (11th Cir. 1985) 774 F.2d 1515, 1523.) But *Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d 101], laid that interpretation to rest. In *Forsyth County,* four justices squarely rejected it (*id.* at pp. 116-117 [dis. opn.]), and the other five also noted that language in *Murdock* v. *Pennsylvania* (1943) 319 U.S. 105, 116 [87 L.Ed. 1292, 1300, 63 S.Ct. 870, 146 A.L.R. 81], from which the confusion about "nominal fees" had arisen, "does not mean . . . that only nominal charges are constitutionally permissible." (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 115].)

Plaintiffs yet contend that because "unlimited" charges may de facto prevent some groups from parading, they are as unconstitutional as the license fee invalidated in *Murdock, supra,* or the poll tax struck down in *Harper* v. *Virginia State Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079], or the ballot access fees condemned in *Lubin* v. *Panish* (1974) 415 U.S. 709 [39 L.Ed.2d 702, 94 S.Ct. 1315]. But those charges were held impermissible—two of them under equal protection principles— because they either amounted to taxes on protected activity or absolutely

---

[5]The court further saw no constitutional infringement in levying a flexible rather than a flat charge, "in the light of varying conditions." (*Ibid.*)

foreclosed its exercise without sufficient reason. In contrast, the departmental service fees are not taxes; they are required to defray specific public costs engendered by the permittee's own activity; and, as discussed below, they leave open expressive alternatives to those unwilling or unable to pay. In the words of *Cox*, *supra*, they are "time, place and manner" regulations, governing how groups may parade in Long Beach to the extent of obstructing traffic (§ 5.60.010(D)). As such, they may validly be imposed as long as they are not "based on the content of the message, . . . [are] narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternatives for communication." (*Forsyth County*, *supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 111].) We consider these factors in turn.

 Plaintiffs contend that the departmental service fee requirement necessarily allows the fees to be based on the content of the parade. Plaintiffs argue that the use of traffic police and barricades, included among the charges, (1) will increase as the parade is more controversial or indeed more popular; and (2) will include, and has already included, expenses in anticipation of onlookers' hostility, for which a speaker cannot be made to pay.

Plaintiffs' first point is not borne out, factually or legally. First, the fees in question respond to the size of the parade and its impacts on normal traffic, not the size of the crowd in attendance. Second, in *Cox*, *supra*, 312 U.S. 569, the Supreme Court approved a flexible fee that varied according to " 'the greater public expense of policing the spectacle, compared with the slight expense of a less expansive and attractive parade or procession, to which the charge would be adjusted.' " (*Id.* at p. 577 [85 L.Ed.2d at p. 1054].)

A more serious constitutional issue is presented, at least in the abstract, by the claim that paraders may not be saddled with the costs of protecting themselves or the public from hostile response to their parade. The Supreme Court has consistently held that "Listeners' reaction to speech is not a content-neutral basis for regulation. [Citations.] Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob. [Citations.]" (*Forsyth County*, *supra*, 505 U.S. at p. __ [120 L.Ed.2d at p. 114], fn. omitted.) In *Forsyth County*, the court for this reason invalidated a parade permit law which local authorities had construed to permit adjustment of the fee in light of the costs of protecting participants or observers. The court concluded, "In light of the Court's subsequent First Amendment jurisprudence, we do not read *Cox* to permit such a premium." (505 U.S. at p. __ [120 L.Ed.2d at p. 115].)

These principles necessarily govern the permissible scope and application of section 5.60.080. But they do not invalidate it. For in this case the

administrative construction and application of the ordinance starkly contrast with those that impelled the ruling in *Forsyth County, supra.* The evidence below was overwhelming that the police deployments for which LBLGP paid under section 5.60.080 were detailed for traffic control duty, and were no greater than necessary for that function. Although the City's police department had developed contingency plans for violence, that was not part of LBLGP's bill. And the fact that the traffic officers would have been called upon is of no moment: there is no content-based deficiency in a permit scheme that requires the permittee to pay costs of traffic control while incidentally providing built-in public safety protection. (*Stonewall Union* v. *City of Columbus* (6th Cir. 1991) 931 F.2d 1130, 1135-1136 [hereafter *Stonewall Union*].) In sum, section 5.60.080 is a content-neutral regulation.[6]

■ The next question in determining whether the departmental service charges are a valid time, place and manner regulation is whether they are "narrowly tailored to serve a significant governmental interest." (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 111].) The answer clearly is yes. Providing for traffic control to rectify a parade's disruption of normal street use is a significant governmental interest. (See *Stonewall Union, supra,* 931 F.2d at p. 1134; cf. *Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 115.) And the charges here are most narrowly tailored, because they correspond to the actual costs of providing the services.[7]

■ Finally, a valid time, place and manner regulation "must leave open ample alternatives for communication." (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 111].) Plaintiffs insist that both section 5.60.080 and indeed Chapter 5.60 as a whole fail this test, because they apply to all public streets, sidewalks and "other public property of the city." (§ 5.60.010(D).) But it is equally true that the permit requirement and the departmental service fees operate only when a group chooses to express itself in a manner calculated to obstruct traffic or the free use of the "other public property." The fees thus can be avoided by any alternative choice of expressive means, including a sidewalk parade or march, however adorned, that does not interfere with traffic. "Notwithstanding [plaintiffs'] general assertions in

---

[6]We reject amici curiae's further contention that content discrimination arises because the ordinance singles out speech-related activity for charges not elsewhere imposed. Section 5.60.080 applies to a host of activities, speech (e.g. this parade) and nonspeech (e.g., the Long Beach Grand Prix), whose common, predictable, intentional feature and effect is to displace traffic. That is the basis for the charge.

[7]Plaintiffs object to the City's charging for a full day's amortized use of police vehicles and other equipment, regardless of what fraction of a day they actually were used. The daily rates for police cars were $23-$24. Whether or not such charges deviate from a proper understanding of section 5.60.080, they do not render the section too broadly "tailored."

their brief[s] concerning the utility of [an obstructive parade]" (*City Council* v. *Taxpayers for Vincent* (1984) 466 U.S. 789, 812 [80 L.Ed.2d 772, 791-792, 104 S.Ct. 2118]), "there has been no showing that the remaining avenues of communication are inadequate." (*Ward* v. *Rock Against Racism* (1989) 491 U.S. 781, 802 [105 L.Ed.2d 661, 682-683, 109 S.Ct. 2746].)

Section 5.60.080 thus fully qualifies as a valid time, place and manner regulation of parades. ▮ Plaintiffs and amici curiae, however, pose a final constitutional objection to the departmental service fees, and particularly to the section's requirement that a permittee reimburse the City for City property damaged or destroyed "by reason of the permittee's use, event or activity." (§ 5.60.080(A).) Plaintiffs contend that this responsibility runs afoul of *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886 [73 L.Ed.2d 1215, 102 S.Ct. 3409] (hereafter *Claiborne*), which held that First Amendment rights of speech and association precluded tort liability either for protected speech or for unprotected member conduct which the organization had not actually or apparently authorized or ratified.

The relevant holding of *Claiborne* was based on traditional principles of agency. (See 458 U.S. at pp. 930-931 [73 L.Ed.2d at pp. 1247-1248].) Section 5.60.080 does not exceed its boundaries. Both the departmental service charge and cleanup reimbursement requirements are textually tied to the activities of the permittee itself. Thus, the section does not purport to impose responsibility for the acts of others. That indeed was the trial court's conclusion when confronted with a charge the City once made for cleaning up graffiti that LBLGP had not scribbled: the court held this charge did not fall within the ordinance's purview, and gave judgment awarding a refund.

We conclude, therefore, that section 5.60.080 does not impose a forbidden burden on speech or association, and that its departmental service charge requirement is a content-neutral, adequately tailored time, place and manner restriction, valid under *Cox*, *supra*, 312 U.S. 569, as well as more recent First Amendment jurisprudence. On this basis, the trial court properly denied plaintiffs' requests for a contrary declaration and for refund of the departmental services charges LBLGP has paid.

### 6. *The Insurance Requirement.*

Section 5.60.070(B) requires as a condition to a permit that the permittee assume a further financial burden, in addition to paying permit fees and departmental service charges. The permittee must procure and maintain throughout the permit period a liability insurance policy, "which policy includes the city, its boards, officers, agents and employees as named

insureds or additional named insureds and which provides the coverages that the city manager determines to be necessary and adequate under the circumstances . . . ." This insurance is required in addition to the permit's requirements, under section 5.60.070(A), that the permittee agree to defend and indemnify the City and its employees from all claims arising out of the permittee's alleged acts or omissions. Finally, the insurance requirement may be waived by the city manager if he determines that an event of not more than one day "does not present a substantial or significant public liability or property damage exposure for the city . . . ." (§ 5.60.070(C).)

 Plaintiffs challenge the insurance requirement of section 5.60.070(B) on many of the grounds on which they attacked the departmental service charges. The City defends the requirement, as it must, as being a valid time, place and manner regulation, like the departmental service charge provision.

However, there are significant differences between the two provisions, both in operation and in justification. The departmental service charges are paid to the city, to reimburse costs actually incurred as a result of the permittee's activities. In contrast, the insurance provision requires payment to a third party, of amounts it determines, using whatever factors it deems appropriate. Further, the permittee makes this compelled payment in exchange not for real costs incident to the activities it intends to undertake, but rather for contingencies that may never eventuate and indeed cannot necessarily be identified. Moreover, the City's justification is correspondingly contingent, and it is advanced without regard to alternatives or to consideration of the permittee's own history of risk.

The insurance requirement thus poses serious questions from the standpoint of being narrowly tailored to serve a significant governmental interest, and also realistically risks being improperly affected by "the content of the message." (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 111].) Before exploring these questions further, we consider plaintiffs' contentions that section 5.60.070 also "delegate[s] overly broad licensing discretion to a government official." (505 U.S. at p. __ [120 L.Ed.2d at p. 111].)

Plaintiffs challenge section 5.60.070 in two such respects. First, subsection (B) provides that the insurance required shall "provid[e] the coverages that the city manager determines to be necessary and adequate under the circumstances." Although this standard is not as open-ended as the "may" which infects section 5.60.030(C), it is extremely broad, and that uncertainty is aggravated by its reference to an unidentified "policy of insurance."

(Accord, *Rock Against Racism* v. *Ward* (S.D.N.Y. 1987) 658 F.Supp. 1346, 1356.) The City defends this discretion as allegedly comparable to the flexibility of parade fees, from nominal to $300, that was approved in *Cox*, *supra*. But the language of subsection (B) is not so constrained, monetarily or otherwise. Granting the City's argument that there must be flexibility to accommodate events as diverse in size as a parade like plaintiffs' and the Long Beach Grand Prix, section 5.60.070(B) does not really impose any restraining standards in setting the extent of the insurance, which in turn must affect its cost to the permittee.

Plaintiffs concurrently attack subsection (C), which allows for a waiver of the insurance requirement if the city manager perceives no "substantial or significant public liability for property damage exposure." In *H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1218-1219 [238 Cal.Rptr. 841], the court held that a similarly worded standard, for imposing insurance on pamphleteers at a shopping center, was too vague to satisfy constitutional requirements. The court further proposed a set of objective criteria far more precise than those found in section 5.60.070.

In sum, the criteria for waiving insurance under subsection (C) are suspect, and subsection (B) is effectively devoid of standards to restrain the discretion of the city manager in fixing the insurance requirement. In the latter respect certainly, section 5.60.070 falls short of First Amendment requirements.[8]

 Whether the insurance requirement satisfies the prime requisite of not varying by virtue of the content of the parade is problematic. On the one hand, section 5.60.070 is neutral on its face. But the evidence disclosed that determining how much a permittee must pay for insurance is a multilayered process. Counseled by its outside insurance consultant, the City fixes the coverage required. Then the amount the permittee pays is decided by the insurance marketplace.

At both levels, concern over how controversial the parade may be has naturally slipped in. The City's consultant testified he considered such risk

---

[8]Indeed, section 5.60.070(B) is so vague as to preclude informed consideration of plaintiffs' separate contention, that the insurance requirement violates the principles of associational tort responsibility stated in *Claiborne*, *supra*, 458 U.S. 886. For we do not know whose liabilities, and for what, the insurance must respond to.

However, assuming section 5.60.070(B) were read to mirror the more specific indemnity requirement of section 5.60.070(A), we question whether requiring such insurance would run afoul of *Claiborne*. Subsection (A) refers to liabilities incurred "as a result of the alleged acts or omissions of permittee or permittee's officers, agents or employees." If construed to mean authorized acts, this language would satisfy *Claiborne*.

factors as hostility to LBLGP's parade in evaluating the insurance required and the prudence vel non of recommending it be waived. He further stated that the monetary effect of such factors would be "for the underwriters in assessing the premium." Plaintiffs produced evidence of some insurers' unwillingness to insure LBLGP. And the City consultant opined generally, "[I]n each case where I have seen anything relating to the underwriting of a parade . . . I regret to say it reflects on the industry, but I think it is largely how much money can they get out of it is the way they would underwrite it. [¶] I don't think there are very sound established principles for underwriting an event like a parade."

Section 5.60.070's delegation of the amount of insurance charges to the market thus appears inescapably to create a system of charges subject to impact and adjustment based on "content," including the element of hostility anticipation. That, of course, is presumptively intolerable (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at pp. 112-115]), and it contributed to the invalidation of a parade insurance requirement in *Invisible Empire, KKK* v. *Mayor et al. of Thurmont* (D.Md. 1988) 700 F.Supp. 281, 285-286. (And cf. *Collin* v. *Smith* (7th Cir. 1978) 578 F.2d 1197, 1209 ["It is true that the requirement does not turn on the content of a proposed demonstration, except in the sense that controversial groups will likely be unable to obtain insurance, as here."].) Thus, it cannot confidently be said that the insurance requirement *does not turn on the content of the paraders' message.*

Equally critical is whether the requirement is narrowly tailored to serve a significant governmental interest. (*Forsyth County, supra,* 505 U.S. at p. __ [120 L.Ed.2d at p. 111].) The City advances two such interests: protection of the public fisc and protection of parade spectators. But only the first of these appears from the face of section 5.60.070: the section refers throughout to the City's liability, and makes it the only concern in allowing a waiver of insurance. So cautioned, we examine both postulated purposes, and the insurance requirement's significance to them.

In reality, the financial protection provided the City by the insurance is extremely limited. As explained at trial by the City's insurance consultant, the $1 million combined single limit policy the City has required of LBLGP—along with City contractors and the like—provides for the City's defense when named in an action based on the permittee's own conduct. It does not substantively cover damages awarded for the City's own fault. Moreover, as plaintiffs and amici curiae point out, the City would face extremely limited exposure in any event, because of California Tort Claims Act limitations and immunities (Gov. Code, §§ 818.4, 821.2 [permits], 835 [dangerous conditions], 845 [police protection]).

Thus, in the words of the City's consultant, the role played by the insurance requirement in protecting the City financially, "is really a contingent liability primarily for defense." The City in effect is requiring the permittee to provide insurance as financial backing for its agreement to defend the City, under section 5.60.070(A). Moreover, the contingent need for that protection is further diminished in the case of plaintiffs, in that there were no claims against the City over the six-year history of plaintiffs' parade before trial. But on this account LBLGP still was required to pay thousands of dollars of premiums. Using the calculus of the First Amendment rather than that of the insurance market, it is difficult to appraise this exaction as being closely tailored to an important governmental purpose.

The second espoused purpose of the insurance requirement is to furnish a pool of financial coverage for injuries parade spectators may suffer from the fault of the permittee (which may, as in this case, be an uninsured organization). "Protecting the public" obviously qualifies as a significant governmental interest. But the question remains whether the means chosen are sufficiently necessary in view of the risks presented. Those risks, again, are by nature speculative, particularly in light of the incident- and accident-free history of LBLGP's parade. Moreover, the City's omnibus insurance requirement extends well wide of the features of the parade that might present hazards traditionally calling for insurance. Thus, although the City emphasizes that the parade includes cars and motorized floats, the City has not relied on the alternative of motor vehicle insurance, nor indeed, the insurance consultant testified, has it even "required evidence of automobile coverage on the vehicle[s] participating in the parade."

The consultant also acknowledged the protective utility of police control, barriers, careful field organization, and participant waivers of liability, all of which have attended plaintiffs' parades. But the ordinance apparently regards these means of safety as supplementary to insurance, rather than vice versa. As the consultant stated with respect to internal parade control, "I think it is far better for the City to leave that as a device for them to reduce their costs rather than for us to waive the up-front protection which we require from the promoters themselves."

In light of this record, the after-the-fact "protection" of the public provided by the insurance requirement cannot be found narrowly tailored to that end. ▮▮▮ Although a time, place and manner regulation need not be the least restrictive means of subserving the public end in question, it must not be "substantially broader than necessary to achieve the government's interest." (*Ward* v. *Rock Against Racism, supra*, 491 U.S. at p. 800 [105 L.Ed.2d

at p. 681].) Other courts that have reviewed parade insurance requirements have uniformly found them to overreach, in view of the overlapping utility and availability of other means of protection as referred to above, and the concomitant absence of a history of claims and hence need for expensive, high-limit coverage. (*Eastern Conn. Citizens Action Group* v. *Powers* (2d Cir. 1983) 723 F.2d 1050, 1056-1057; *Invisible Empire, KKK* v. *Mayor et al. of Thurmont, supra,* 700 F.Supp. at p. 285; *Collin* v. *Smith* (N.D.Ill. 1978) 447 F.Supp. 676, 685, affd. (7th Cir.) 578 F.2d 1197.)[9] Here too, where the cost of the insurance has closely threatened (until preliminarily enjoined) to prevent plaintiffs' protected activity yet that coverage has never had to be called upon, section 5.60.070(B)'s insurance requirement appears to be a relatively gratuitous burden, "substantially broader than necessary to achieve the government's interest." (*Ward* v. *Rock Against Racism, supra,* 491 U.S. at p. 800 [105 L.Ed.2d at p. 681].) Given also the overbroad discretion granted the city manager in fixing the requisite coverage, and the openness to content-based costing that results from remitting a permittee to the underwriting market, the insurance requirement of section 5.60.070 cannot be upheld.[10]

The foregoing conclusions, like the rest of this decision, apply only with respect to parades, which enjoy First Amendment protection. The City thus is not disabled from enforcing the present insurance requirement with respect to other events, such as the Grand Prix or plaintiffs' festival. Moreover, we do not categorically condemn insurance requirements for parades. (See *Eastern Conn. Citizens Action Group* v. *Powers, supra,* 723 F.2d at p. 1057.) A requirement that adhered to the requisites of a valid time, place and

---

[9]The last case bears quoting: "[T]he burdensome effect of the insurance requirement itself has not been shown to be necessary. The government may impose financial burdens on the exercise of First Amendment rights, such as permit fees, only when the amount involved is reasonable and directly related to the accomplishment of legitimate governmental purposes. [Citations.] In this case, defendants have presented no evidence whatsoever of the . . . need for such a burdensome insurance requirement. Nothing in the record shows that Skokie or any comparable municipality has ever been threatened with damage by a public assembly which would have been prevented or alleviated by an insurance requirement of this type." (*Collin* v. *Smith, supra,* 447 F. Supp. at p. 685.)

[10]In support of the requirement's validity, the City cites *Jacobsen* v. *Harris* (8th Cir. 1989) 869 F.2d 1172, which upheld against First Amendment challenge an ordinance that required publishers who wished to emplace newsracks on city property to carry liability insurance for them. The court emphasized that the ordinance required all persons using city property to insure the city against obstructions on it, and that there had been a history of claims based on such obstructions. (*Id.* at p. 1174.) In light of the factors and authorities discussed above, we do not consider the *Jacobsen* case's one-paragraph holding dispositive here.

manner regulation would not be invalid. But for the numerous reasons shown, section 5.60.070, as applicable to parades, is.[11]

### 7. *City Subsidy of Parades.*

■ Plaintiffs' final contentions concern allegedly discriminatory relaxation of the parade regulations of Chapter 5.60. Section 3.64.100 of the Long Beach Municipal Code creates a "special advertising and promotion fund," which is to be used, inter alia, "For advertising, promotional, and public relations projects calling attention to the city, its natural advantages, resources, enterprises, attractions, climate, and facilities." The City has used this fund to pay the departmental service charges for several parades, including a Martin Luther King Day parade and the culmination of a national Hands Across America parade at the Queen Mary. Except for the Martin Luther King Day parade, which was supported in celebration of a national holiday, the City chose to subsidize these events on the basis that they gave the City public and economic exposure, often televised. However, the City in 1987 declined LBLGP's request for similar sponsorship. Plaintiffs contend this defrayal of parade charges constitutes impermissible content discrimination in the administration of the departmental service and related charges.

We disagree. In using the promotional fund the City has not maintained or administered section 5.60.080 to disfavor or suppress one viewpoint in favor of another. Rather, the City has used its funds to promote and facilitate events it sponsors or otherwise encourages, for the benefit of the City. The departmental service charges are not discriminatorily applied: they are imposed on all, but in some cases paid by the City's treasury. "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." (*Harris* v. *McRae* (1980) 448 U.S. 297, 317, fn. 19 [65 L.Ed.2d 784, 804-805, 100 S.Ct. 2671].)

The same issue was presented in *Stonewall Union, supra,* 931 F.2d 1130, wherein the organizers of a gay rights parade complained about the city's sponsoring and paying the fees of other parades. The court stated: "[A]lthough plaintiffs have a First Amendment right to parade on behalf of gay and lesbian rights, they do not have a right to demand that the City . . . sponsor that right by paying their parade permit fees because it sponsors

---

[11]We decline LBLGP's request for reversal and direction of judgment in its favor on its claim for damages from the City in the amount of the insurance premiums LBLGP has paid. Not only did LBLGP fail to establish the amounts attributable to the parade as opposed to the festival, but more fundamentally LBLGP has not presented a coherent theory of why the City should be held liable for sums paid to insurers in exchange for coverage provided. LBLGP has not carried its burden of establishing a right to judgment on this claim.

other speech-related activities. If defendants can adequately show that the parades which they have sponsored and for which they have paid the permit fees are reasonably related to the government function which the sponsoring department of the city government performs, . . . [that] does not mean that the ordinance is discriminatorily applied." (*Id.* at p. 1138.)

In the same vein, plaintiffs also challenge, as allegedly granting unconfined discretion, the preliminary language of section 5.60.020(A), which excepts from the permit requirement activity conducted "pursuant to the terms of a permit, lease or contract which has been specifically authorized by the city council." But this preamble is not of the same nature as the portions of Chapter 5.60 we have held grant overbroad discretion. It is not a delegation of power to an official but a recognition of the innate authority of the City's legislative body. The city council has the power to grant special permits, and to amend Chapter 5.60; the mere existence of that potential does not present a case of unguided discretion. And plaintiffs' claim that the council authorized the Martin Luther King Day parade without sufficient formality presents a municipal law question, not a constitutional one.

## IV.

### DISPOSITION

The judgment is reversed insofar as it sustains the constitutionality of section 5.60.070 with respect to parades, and of section 5.60.030 insofar as it provides for a 30-working-day permit application period for parades and for waiver thereof, and fails to provide a time limit for decision of a parade permit application. The trial court shall enter declaratory judgment for plaintiffs on those issues. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Gates, Acting P. J., and Nott, J., concurred.

A petition for a rehearing was denied April 8, 1993, and the petition of plaintiffs and appellants for review by the Supreme Court was denied June 24, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.

APPENDIX

Chapter 5.60

PARADES, SPECIAL EVENTS AND
FILMING ACTIVITIES

Sections:

5.60.010 Definitions.
5.60.020 Permit—Required.
5.60.030 Permit—Application.
5.60.040 Permit—Fees.
5.60.050 Permit—Term.
5.60.060 Permit—Denial or revocation.
5.60.070 Insurance.
5.60.080 Departmental service charges.
5.60.090 Refunds.
5.60.100 Compliance investigation.
5.60.110 Interfering with activity prohibited.
5.60.120 Penalty for violation.

5.60.010 Definitions.

A. "City departmental service charges," as used in this chapter, means the actual costs which a department of the city incurs in connection with activities for which a permit is required under this chapter, including, but not limited to, the costs of administration or coordination services, support personnel, equipment, materials and supplies and related items such as fringe benefits and overhead burden.

B. "Filming activity," as used in this chapter, means the taking or making of any motion picture or still photograph; however, said term does not mean and does not include filming or photography for news media purposes or filming or photography which is not for distribution or sale for commercial purposes.

C. "Local special event," as used in this chapter, means and includes, but is not limited to, promotional or fund-raising activities, athletic or sporting events, live musical events, community celebrations and observances, or neighborhood

activities such as block parties, picnics or dances.

D. "Parade," as used in this chapter, means and includes a parade, procession, march, pageant, review, ceremony or exhibition which is conducted in, on, upon, or along any portion of any public street, sidewalk or other property owned or controlled by the city, so as to impede, obstruct, impair or interfere with the free use of such public street, sidewalk, or other public property of the city, except, however, the provisions of this chapter shall not apply to funeral processions. (Ord. C-6260 § 1 (part), 1986).

5.60.020 Permit—Required.

A. Except as otherwise provided by this code or other applicable law, rule or regulation or any permit or license issued hereunder or pursuant to the terms of a permit, lease or contract which has been specifically authorized by the city council, so person shall conduct or cause to be conducted, participate or engage in, hold, manage, employ, permit or allow another to conduct a parade, local special event or filming activity in, on or upon any city street, sidewalk, alley, park, way, pier, public place or public property which is owned or controlled by the city without first having obtained a written permit from the city manager or his designee.

B. The city manager may also approve and permit the sale or use of alcoholic beverages in public areas where it is not expressly prohibited by this code, provided that he shall do so in accordance with any procedures and criteria that may be adopted from time to time by resolution of the city council. Any denial by the city manager of approval under this subsection B may be appealed to the city council by the applicant, provided that such appeal must be filed in writing with the city clerk no later than ten days following denial by the city manager. (Ord. C-6260 § 1 (part), 1986).

5.60.030 Permit—Application.

A. The application for a permit under this chapter to conduct or engage in any parade, local special event or filming activity which involves the use of city streets, alleys, sidewalks, parks, piers, ways or other public property owned or controlled by the city shall be filed with the city manager or his designee. Such applications shall be filed at least thirty working days prior to the date that the permit is to become effective except that applications for block party permits shall be filed at least ten working days prior to the date the permit is to become effective, and applications for filming activity permits shall be filed at least three working days prior to the date the permit is to become effective. Each application shall be accompanied by a nonrefundable permit application fee in the amount established by resolution of the city council. The city manager or his designee shall have the authority, in his discretion, to consider any application for a permit which is filed later than the time prescribed in this section.

B. Applications shall be upon a form which is furnished by or acceptable to the city manager or his designee. Each application shall contain full, complete and detailed information including, but not limited to, the following:

1. A description of the proposed use, event or activity;

2. The street or other public property and the specific area or areas thereof which will be utilized in connection with the proposed use, event or activity;

3. The manner in which the public property will be utilized;

4. The date or dates and the specific times thereof that the public property is to be utilized for the described use, event or activity;

5. The name, address and telephone number of the person, entity or organization sponsoring or conducting the proposed use, event or activity; and

6. The name, address and telephone number of the person or persons to be contacted regarding the application or permit.

The city manager may refer the application to the appropriate city departments for review, evaluation, investigation and recommendations

by the departments regarding approval or disapproval of the application.

C. The city manager or his designee may issue a permit under this chapter if it is determined that the following criteria have been met:

1. The proposed use of the property is not governed by or subject to any other permit procedures provided elsewhere in this code or other applicable laws, rules or regulations; and

2. The preparation for or the conduct of the proposed use, event or activity will not unduly impede, obstruct, impair or interfere with the public's use of the street or other public property; and

3. The preparation for or the conduct of the proposed use, event or activity will not unduly impede, obstruct or interfere with the operation of emergency vehicles or equipment in or through the particular permit area, or adversely affect the city's ability to perform municipal functions or furnish city services in the vicinity of the permit area; and

4. The proposed use, event or activity does not present a substantial or unwarranted safety or traffic hazard; and

5. The proposed use, event or activity will not have a significant adverse environmental impact; and

6. That in the case of proposed filming activity, the proposed proposed activity will provide suitable and appropriate advertisement, acknowledgment, credit or other such promotional benefit to the city; and

7. That in the case of a block party or other similar neighborhood event, the applicants have submitted a petition in favor of the event which has been signed by all the residents of the block affected by the permit.

D. In addition to the requirements of this code or other applicable laws or rules or regulations promulgated by the city manager, each permit shall contain such terms and conditions regarding the time, place and manner of utilizing the city streets or other public property which are necessary and appropriate under the circumstances. (Ord. C-6260 § 1 (part), 1986).

5.60.040 Permit—Fees.

Except as otherwise provided by this code or other applicable law, rule or regulation, or by the terms of a permit, license, lease or contract which has been specifically authorized by the city council, the permit application fees, daily fees, and other additional fees for the use of the city streets or other city-owned or controlled property pursuant to this chapter shall be established by the city council by resolution. The total amount of the fees due for the entire permit period shall be paid to the city at least three days prior to the date that the permit becomes effective. (Ord. C-6260 § 1 (part), 1986).

5.60.050 Permit—Term.

A. Any permit issued under this chapter shall not be for a period of more than two consecutive days except as otherwise provided in this code; however, the city manager, in his discretion, may extend the duration of any permit, except as otherwise provided in this code, for one additional period of not more than three consecutive days.

B. Any permit issued for Shoreline Aquatic Park will be for no more than two consecutive days by any one person or group during a one-year period. During the summer period from and including the Friday prior to Memorial Day through the Tuesday following Labor Day, exclusive use permits for Shoreline Aquatic Park will not be permitted unless the permitted event is open and free to the public, and in no event may the sale or consumption of alcohol be permitted in Shoreline Aquatic Park during that summer period. (Ord. C-6260 § 1 (part), 1986).

5.60.060 Permit—Denial or revocation.

The city manager or his designee may deny any application for a permit or revoke any permit if the city manager or his designee determines that the applicant therefor or holder thereof or any agent, employee or associate of any such applicant or per-mittee has made any false or misleading statement in an application or has not fully complied with the requirements of

this chapter or has violated any of the provisions of this chapter or the provisions of any other applicable law, rule or regulation. Any permit issued under this chapter may be summarily revoked. (Ord. C-6260 § 1 (part), 1986).

#### 5.60.070 Insurance.

A. Each permit shall expressly provide that the permittee agrees to defend, protect, indemnify and hold the city, its officers, employees and agents free and harmless from and against any and all claims, damages, expenses, loss or liability of any kind or nature whatsoever arising out of, or resulting from, the alleged acts or omissions of permittee, its officers, agents or employees in connection with the permitted event or activity; and the permit shall expressly provide that the permittee shall, at permittee's own cost, risk and expense, defend any and all claims or legal actions that may be commenced or filed against the city, its officers, agents or employees, and that permittee shall pay any settlement entered into and shall satisfy any judgment that may be rendered against the city, its officers, agents or employees as a result of the alleged acts or omissions of permittee or permittee's officers, agents or employees in connection with the uses, events or activities under the permit.

B. Concurrent with the issuance of a permit under this chapter, and as a condition precedent to the effectiveness of the permit, the permittee shall procure and maintain in full force and effect during the term of the permit a policy of insurance from a reliable insurance company authorized to do business in the state, which policy includes the city, its boards, officers, agents and employees as named insureds or additional named insureds and which provides the coverages that the city manager determines to be necessary and adequate under the circumstances and proof of insurance shall be submitted to the city at least ten days prior to the event.

C. If the city manager determines that a particular use, event or activity which is for a permit period of no more than one day does not present a substantial or significant public liability or property damage exposure for the city or its officers, agents and employees, the city manager may give a written waiver of the insurance requirements of this section. (Ord. C-6260, § 1 (part), 1986).

#### 5.60.080 Departmental service charges.

A. In addition to the payment of the nonrefundable permit application fees, the daily fees and any other fees prescribed by resolution of the city council, a permittee shall pay the city for all city department service charges incurred in connection with or due to the permittee's activities under the permit. If city property is destroyed or damaged by reason of permittee's use, event or activity, the permittee shall reimburse the city for the actual replacement or repair cost of the destroyed or damaged property.

B. City departments shall submit the final invoices and billings for departmental charges to the permittee no later than ten working days after the expiration date of the permit.

C. At least three days prior to the date that any permit under this chapter is to become effective, the applicant shall pay to the city a cash deposit in an amount sufficient to cover the total city departmental charges which the city manager or his designee estimates will be incurred in connection with the permit. The payment of any such advance cash deposit may be waived by the city manager or his designee. (Ord. C-6260 § 1 (part), 1986).

#### 5.60.090 Refunds.

If a permittee is unable to hold or conduct a use, event or activity because of inclement weather or due to some other cause not within the permittee's control, and the permittee submits written request for the refund of such fees to the city manager's office within ten days after the date that the use, event or activity was to have been held or conducted, the city manager may authorize the refund of the fees or a pro rata portion thereof, except the nonrefundable application fees, which have been paid by the

permittee to the city in connection with a permit issued under this chapter. (Ord. C-6260 § 1 (part), 1986).

5.60.100 Compliance investigation.

It shall be the duty, responsibility and authority of the city manager or his designee to monitor, investigate and determine whether a permittee fully complies with all of the terms and conditions of the permit and the provisions of any applicable laws, rules or regulations. (Ord. C-6260 § 1 (part), 1986).

5.60.110 Interfering with activity prohibited.

No person shall knowingly join or participate in any parade, local special event or filming activity conducted under permit from the city in violation of any of the terms of the permit, nor knowingly join or participate in any permitted parade, local special event or filming activity without the consent and over the objection of the permittee, nor in any manner interfere with the progress or orderly conduct of any such parade, local special event or filming activity. (Ord. C-6260 § 1 (part), 1986).

5.60.120 Penalty for violation.

Any person who violates any of the provisions of this chapter shall be guilty of a misdemeanor. (Ord. C-6260 § 1 (part), 1986).