## PUBLIC SAFETY

**AUTHORITY OF LAW ENFORCEMENT OFFICIALS TO ESCORT MOTORCYCLE CHARITY RIDES OUTSIDE OF THEIR JURISDICTION – CONSTITUTIONALITY OF REQUIREMENT THAT ORGANIZERS OF SPECIAL EVENTS ON PUBLIC ROADS OBTAIN INSURANCE TO COVER LOSSES TO THE GOVERNMENT AND THE PUBLIC**

July 18, 2014

*Larry L. Klimovitz*
*Executive Director*
*Baltimore Metropolitan Council*

On behalf of the Baltimore Metropolitan Council, you have asked a series of questions about the ability of Maryland law enforcement agencies to provide escorts for large-scale motorcycle charity rides and to enforce Maryland traffic laws while doing so. These charity rides typically involve large numbers of bikers traveling long distances across multiple jurisdictions within the State, and the organizers of these events have sometimes requested police escorts to facilitate the safe flow of traffic around the riders. These requests have given rise to a number of concerns among local governments. First, when you posed your questions, it was unclear whether police officers had the authority to speed, pass through red lights, and otherwise disregard the rules of the road while conducting escort duty. Second, because State law limits the authority of local police officers to act outside of their jurisdictions, several counties have expressed concern that their officers might not be able to participate in escort duty for charity rides that leave their home jurisdictions. Finally, these counties have also asked whether the State Highway Administration ("SHA") and local jurisdictions may require the organizers of charity rides and other special events on Maryland roads to obtain insurance to cover the events.

More specifically, you have asked our opinion on the following three questions:

> (1) What authority, if any, does a law enforcement agency have to escort motorcycle charity rides in an "emergency

status," allowing them to disregard the normal rules of an "open" road?

(2) Does Maryland law regarding the extra-jurisdictional authority of police officers prevent law enforcement agencies from assisting one another with events requiring escorts or traffic control? If so, would a specifically drafted mutual aid agreement between area jurisdictions provide the necessary authority?

(3) When the SHA or a local jurisdiction issues a permit for a special event that takes place on a public roadway, can it require that the organizer provide proof of liability insurance to cover the organizer as well as the government authorities involved in managing the event?

Your first two questions were addressed by the General Assembly in legislation enacted during the 2013 session. *See* 2013 Md. Laws, ch. 66. That legislation answers your first question; it authorizes police officers to provide escorts when needed to "[f]acilitat[e] the safe movement of vehicles or pedestrians," which would encompass large-scale motorcycle charity rides. When doing so, police officers may operate in "emergency status" and disregard the normal rules of an open road. As to your second question, the same legislation also authorizes local police officers to escort vehicles through other jurisdictions and take certain actions, such as blocking and directing traffic, necessary to perform this extra-jurisdictional escort duty. The new law does not, however, generally authorize an officer to enforce the traffic laws, make arrests, or issue citations for the violation of traffic laws outside of the officer's jurisdiction.

As to your third question, we conclude that SHA and local governments may impose insurance requirements for special events on roads under their control, but the State agencies and localities must be aware that such insurance requirements, to the extent that they apply to activities involving the exercise of free speech rights, are suspect under the First Amendment. Although such requirements are not clearly unconstitutional, jurisdictions should be cognizant of the potential First Amendment implications for those requirements and, when crafting their

policies, should consider including certain exceptions that will reduce the risk of curtailing free expression.

# I

## Background

Law enforcement agencies frequently provide police escorts for funeral processions, dignitaries, and over-sized commercial vehicles. According to the Maryland State Police ("MSP"), motorcades and escorts are sometimes necessary to ensure the safety of the escorted vehicles and other drivers on the road as well as to facilitate the flow of traffic. *See* Hearing on S.B. 621 Before the Senate Judicial Proceedings Committee, 2013 Leg., Reg. Sess. (2013) (hereinafter "Hearing on S.B. 621"). As we understand it, escort duty includes two primary components: (1) police vehicles will drive with the escorted vehicles in "emergency status" (*i.e.*, with their lights flashing and sirens activated) to warn other drivers on the road; and (2) sometimes police officers will drive ahead to divert traffic, block entrance ramps, or block intersections.[1] Both of these tasks sometimes require police officers to travel across jurisdictional boundaries and disregard the usual rules of the road, such as speed limits, traffic signals, and stop signs.

Law enforcement agencies usually rely on motorcycle officers to perform escort duty because motorcycles can move through traffic more safely and easily than their four-wheeled counterparts. *Id.* (written testimony of MSP). However, no single police agency in Maryland has a sufficient number of motorcycle officers to safely conduct large-scale escorts that cross jurisdictional boundaries without assistance from other jurisdictions. *Id.* Therefore, escorts typically require cooperation among several law enforcement agencies.

Recent years have seen an increase in the number of large-scale motorcycle charity rides. In response, the Baltimore

---

[1] It is not clear from the opinion request whether this second component of escort duty will always be required for motorcycle charity rides because—according to your request—many motorcycle ride organizers have expressed a preference that roads not be closed for their events. We assume, however, that some form of traffic control might be necessary to ensure public safety and that the police might sometimes decide that road closures are required.

Regional Transportation Board ("BRTB")[2] formed a task force to consider the issues involved in providing escorts to charity rides and to create uniform policies and procedures that would govern responses to escort requests. The task force includes State transportation officials and law enforcement representatives from every jurisdiction represented on the BRTB. You indicate that, during the initial meetings of this task force, some members raised the concerns that prompted the Baltimore Metropolitan Council to request this opinion.

## II

## Analysis

### A. *Whether Police Officers May Operate in Emergency Status and Operate Outside Their Jurisdictions While Escorting Motorcycle Charity Rides*

Your primary questions are (1) whether police officers may operate in "emergency status" and disregard the normal rules of the road when providing escorts for motorcycle charity rides, and (2) whether local police officers may participate in escort duty outside of their home jurisdictions. We will treat these two questions together because they were both largely resolved by legislation enacted during the 2013 session. Although police agencies might already have had the authority to conduct escort duty for motorcycle charity rides under the law as it existed at the time of this request, the Legislature's changes to the law during the 2013 session clarify that police officers have the necessary powers to escort these charity rides and operate outside of their jurisdictions during escort duty.

---

[2] The BRTB is the Metropolitan Planning Organization for the Baltimore region. Federal law requires each metropolitan region to have such an organization. *See* 23 U.S.C. § 134(d). The BRTB includes 11 members representing the cities of Annapolis and Baltimore; the counties of Anne Arundel, Baltimore, Carroll, Harford and Howard; the Maryland Transit Administration; and the Maryland Departments of Transportation, the Environment, and Planning. *See* Baltimore Metropolitan Council, *About the BRTB*, http://www.baltometro.org/about-the-brtb/about-the-brtb (last visited April 10, 2014).

### 1. Legal Background

When these questions were initially posed to us, no State law expressly governed police authority to disregard speed limits, traffic signals, and other rules of the road during escort duty. A police vehicle only had explicit authorization to exceed the speed limit, pass through a red signal or stop sign, or disregard a traffic control device or regulation governing the direction of movement when "(1) [r]esponding to an emergency call; (2) [p]ursuing a violator or suspected violator of the law; or (3) [r]esponding to, but not while returning from, a fire alarm." *See* Md. Code Ann., Transp. ("TR") § 21-106 (2012 Repl. Vol.).[3] Moreover, police officers only had explicit authority to provide escorts for certain oversized vehicles. *See* COMAR 11.04.04.06. Although MSP officers have the duty to "maintain the safe and orderly flow of traffic on public streets and highways," the law says nothing about those officers' powers during escort duty. *See* Md. Code Ann., Public Safety ("PS") § 2-301(a)(2)(vi) (2011 Repl. Vol.). Similarly, with respect to local jurisdictions, the Maryland Vehicle Law[4] permits "a local authority, in the reasonable exercise of its police power," to "[r]egulat[e] traffic by means of police officers or traffic control devices" and to "[r]egulat[e] or prohibit[] processions or assemblies on highways," but it does not provide any express authority for police to provide escorts and to disregard the rules of the road when doing so.[5] *See* TR § 25-102(a)(2), (3).

When we first received this opinion request, local police officers also had no explicit authority to cross jurisdictional boundaries during escort duty. MSP officers have broad powers to enforce Maryland laws—including traffic laws—throughout the State, *see* PS § 2-412, but the authority of local police officers is more limited. The Criminal Procedure Article "does *not* authorize a [local] police officer . . . to enforce the Maryland Vehicle Law beyond the police officer's sworn jurisdiction,

---

[3] Unless otherwise indicated, all citations to the Transportation Article are to the 2012 Replacement Volume and the 2013 Supplement.

[4] The Maryland Vehicle Law includes "Titles 11 to 27 of the Transportation Article." *See* TR § 11-206.

[5] We are aware of two statutory provisions that expressly allow for the suspension of the requirements of the Motor Vehicle Law, but they apply only to "an approved motor vehicle or bicycle racing event" or "foot racing event" and exempt only the "participants" in such races. *See* TR §§ 21-1211(c), 21-1211.1(c).

unless the officer is acting under a mutual aid agreement authorized under § 2-105 of this subtitle." Md. Code Ann., Crim. Proc. ("CP") § 2-102(b)(2) (2008 Repl. Vol.) (emphasis added).[6] Therefore, if a court were to conclude that participating in escort duty constituted "enforcement" of the Maryland Vehicle Law as that term is used in CP § 2-102(b)(2), local police officers might have been prohibited from crossing jurisdictional lines during escort duty.[7]

The BRTB and many local jurisdictions were concerned that the lack of express authority for local officers to act outside of their jurisdictions would preclude the inter-agency cooperation necessary for police escorts. Indeed, "many local jurisdictions [were] hesitant to volunteer their law enforcement personnel for escort duty that crosse[d] local jurisdictional boundaries because of a lack of authority and concern over potential liability." Hearing on S.B. 621 (written testimony of the Maryland Association of Counties). During one of President Obama's trips through Maryland in 2012, for example, some police agencies stopped escorting the motorcade as it moved from one jurisdiction to another. *Id.* (written testimony of MSP). Uncertainty about the scope of the officers' extra-jurisdictional authority thus had the potential to compromise the safety of such motorcades.

While this opinion request was pending, the General Assembly enacted legislation to clarify both the general authority of police officers to provide escorts and the extra-jurisdictional powers of local officers during such escorts. 2013 Md. Laws, ch. 66. The Maryland Vehicle Law now provides that police officers are not bound by certain rules of the road and limits on extra-

---

[6] In other contexts beyond the Maryland Vehicle Law, however, "a police officer may make arrests, conduct investigations, and otherwise enforce the laws of the State" outside of the officer's jurisdiction if "an emergency exists," or if the police officer is "participating in a joint investigation" with an officer who has local jurisdiction, "rendering assistance to another police officer," or "acting at the request of a police officer or State Police officer." CP § 2-102(b)(2). The total prohibition on the extra-jurisdictional enforcement of the Maryland Vehicle Law thus operates as an exception to this general rule.

[7] Although we have some doubt that merely participating in escort duty by driving along with the motorcade in emergency status would constitute "enforcement" of the Motor Vehicle Law, the 2013 legislation made that question moot.

jurisdictional authority "while performing motorcade or escort duty if the motorcade or escort duty involves: (i) Homeland security; (ii) A funeral; (iii) A dignitary; or (iv) Facilitating the safe movement of vehicles or pedestrians that are or will be near the motorcade or escort." TR § 21-106(a)(2). More specifically, as long as the officer is using the appropriate visual or audible signals on the emergency vehicle,[8] the officer may:

>    (1)   Park or stand without regard to the other provisions of this title;

>    (2)   Pass a red or stop signal, a stop sign, or a yield sign, but only after slowing down as necessary for safety;

>    (3)   Exceed any maximum speed limit, but only so long as the driver does not endanger life or property;

>    (4)   Disregard any traffic control device or regulation governing direction of movement or turning in a specified direction; and

>    (5)   Travel through any local jurisdiction in the State as necessary to perform and return from motorcade or escort duty.

*Id.* § 21-106(b). As explained below, we believe that this new legislation resolves most of the issues raised by your request.

### 2.  Police Officers' Power to Perform Escorts in 'Emergency Status"

First, we conclude that the 2013 legislation authorizes police agencies to provide escorts to motorcycle charity rides. As we understand the role of police officers during escort duty, the

---

[8] Although drivers of most "emergency vehicles" must display their lights and sirens when exercising the special privileges at issue, police vehicles are usually only required to use their audible signal. *See* TR § 21-106(c)(1); *see also id*. § 11-118 (defining "emergency vehicle"). But nothing prevents police officers from also using their visual signal when escorting charity rides. In fact, they must use their visual signal if they "[p]ark or stand" where they otherwise would be prohibited from doing so, *id.* § 21-106(c)(2), as might be necessary to close entrance ramps along the motorcade route.

special privileges granted by § 21-106(b) provide police officers with all the powers necessary to conduct motorcades or escorts in emergency status. Police officers may speed, ignore traffic signals, and, if necessary, stop the car in the middle of the road to block an entrance ramp or direct traffic. *See id.* § 21-106(b). Therefore, the only question is whether motorcycle charity rides fall within the categories of events for which police agencies are authorized to exercise these special privileges. To resolve that question, we will look to the plain meaning of the statute, and resolve any ambiguity by analyzing the text through interpretive canons and the legislative history.

The first three categories of events in which an officer may exercise the privileges set forth in § 21-106—homeland security, funerals, and escorting dignitaries—presumably do not encompass motorcycle charity rides. However, on its face, the fourth category—escorts that involve "[f]acilitating the safe movement of vehicles or pedestrians that are or will be near the motorcade or escort"—likely would include large-scale charity rides given that providing escorts for such events would help facilitate the safe transit of other vehicles and pedestrians near the charity ride. The use of the disjunctive term "or" in separating the four items on the list of permissible escorts suggests that the General Assembly intended this final item in the list to be its own category of "escort duty" on par with escorts involving homeland security, dignitaries, and funerals. *See*, *e.g.*, *Enterprise Leasing Co. v. Allstate Ins. Co.*, 341 Md. 541, 548 (1996) (relying on the Legislature's decision to use disjunctive "or" rather than conjunctive "and" in interpreting statute); *Schlossberg v. Citizens Bank*, 341 Md. 650, 576 (1996) (holding that the use of "or" in a list of three options "indicates that each of these three options has a different effect"). Under this reading of the statute, officers have the authority to escort motorcycle charity rides.

We recognize that this provision could plausibly be read otherwise. It might mean that police officers may ride alongside a motorcade for a funeral, a dignitary, or for homeland security purposes *and* may also close entrance ramps, block intersections, and take other measures to "[f]acilitat[e] the safe movement of vehicles" while doing so. This alternate reading is plausible because it gives effect to the Legislature's specific reference to escorts for homeland security, dignitaries, and funerals. Given that all three of these specific categories presumably involve "[f]acilitating the safe movement of vehicles," granting the fourth category equal status could arguably render the first three

categories surplusage—an interpretive outcome that canons of statutory construction caution us to avoid. *See* 97 *Opinions of the Attorney General* 72, 88 n.11 (2012). And while this inter-pretation ignores the Legislature's use of the word "or," that term "may be read in the conjunctive when the context reasonably supports the inference that such a construction is necessary to effectuate the intent of the Legislature." *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 32 (2007).

Although these two competing interpretations show that the text of the statute may be ambiguous, other considerations suggest that the General Assembly did not intend to limit police authority to provide escorts to homeland security, funerals, and dignitaries. First, it would seem unnecessary for the Legislature to clarify that police officers have the power to facilitate the safe movement of traffic during one of the specified escorts when the statute already gives police officers the powers necessary to block traffic, exceed the speed limit, and take other measures to provide for the safe transit of the motorcade for those events. *See* TR § 21-106(b)(1)-(4). We think it more likely that the General Assembly listed the three specific categories of escorts to make clear that those three categories were covered and to provide illustrative examples of the types of escorts that require "[f]acilitating the safe movement of vehicles or pedestrians that are or will be near the . . . escort."

Second, application of the canon of statutory construction *ejusdem generis* supports our reading of the statute. Pursuant to this canon, Maryland courts recognize that the Legislature often provides specific illustrative examples followed by a general category to avoid "spelling out in advance every contingency in which the statute could apply." *In re Wallace W.*, 333 Md. 186, 190-91 (1993) (internal quotation omitted). Thus, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed," *Haile v. State*, 431 Md. 448, 468-69 (2013) (quoting *Black's Law Dictionary* 594 (9th ed. 2009)), or things that are "similar in nature" to the specific items, 2A Sutherland Stat. Const. § 47.17, at 359-60 (7th ed. 2007). The common denominator for homeland security escorts, funeral escorts, and dignitary escorts—to the extent that they have one—is that all of these events can disrupt the safe and free flow of traffic. Large-scale motorcycle charity rides could also disrupt the safe and free flow of traffic, and escorts may be needed to prevent harm to drivers and pedestrians on Maryland roads. Therefore, we think that escorts for motorcycle charity rides would fall within the "same class" as those specific examples

listed in TR § 21-106, *see Haile*, 431 Md. at 468-69, and the general category for escorts that involve "[f]acilitating the safe movement of vehicles or pedestrians that are or will be near" the escort should be interpreted to include these types of charity rides.

Finally, the legislative history of the 2013 amendments confirms our interpretation. The testimony on the relevant bills suggests that the General Assembly intended to cover more than just escorts for funerals, homeland security, and dignitaries. Senator Raskin, the sponsor of the legislation, explained during committee hearings that the amendments would "authorize law enforcement agencies to perform motorcade and escort services during dignitary transportation, funeral services, *and other kinds of special motorcade situations*" where a traffic detail has been established. Hearing on S.B. 621 (emphasis added); *see also id.* (written statement of MSP) ("[Escorts] range from Homeland Security events, dignitary escorts, funeral escorts, and *any other escorts that are used to safely and efficiently facilitate the free flow of traffic*." (emphasis added)). Senator Raskin then asked MSP Sergeant Brett Canfield to "explain . . . why this [bill] is necessary." According to Sergeant Canfield, the bill was necessary to ensure safety on the roadways and to facilitate the free flow of traffic during escort duty. He explained that escorts "at one end of the spectrum" might include motorcades for dignitaries and funerals, but that police agencies also provide "countless escorts for charity" and that "[l]arge groups traveling on Maryland roadways without [police] assistance and guidance often pose the potential" to disrupt traffic flow and cause accidents. Hearing on S.B. 621.

As Sergeant Canfield's testimony makes clear, the problem the Legislature was trying to address through its 2013 legislation does not depend on the specific purpose for which an escort is requested. To ensure the safety of the roads, police need the authority to provide escorts whenever the relevant event might disrupt the free flow of vehicular or pedestrian traffic. Unsurprisingly, therefore, the statute provides that police agencies have the authority to provide escorts or motorcades when doing so would involve "[f]acilitating the safe movement of vehicles or pedestrians that are or will be near the motorcade or escort." TR § 21-106(a)(2)(iv). We found no indication that the General Assembly intended to withhold this authority from police officers escorting events such as large-scale motorcycle charity rides.

In sum, we conclude that the authority provided by the 2013 legislation extends to motorcycle charity rides under the circumstances described in § 21-106(a)(2)(iv) of the Transportation Article.

### 3. Local Police Officers' Authority to Participate in Escorts Outside of Their Jurisdiction

The 2013 legislation also clarifies the powers of police officers when conducting escort duty outside their jurisdictions. An officer participating in motorcades and escorts may now "[t]ravel through any local jurisdiction in the State as necessary to perform and return from motorcade or escort duty" so long as the officer's jurisdiction notifies any other jurisdiction that the officer will enter. TR § 21-106(b)(5), (c)(4). Although the statute could be read to authorize only the officer's "travel" through any local jurisdiction while on escort duty, we think it must also include the authority to exercise the privileges in paragraphs (b)(1) through (b)(4) outside of the officer's home jurisdiction. We also think that the Legislature intended to authorize police officers to take certain other actions involving traffic control "necessary to perform . . . escort duty," such as blocking and directing traffic and otherwise "[f]acilitating the safe movement of vehicles or pedestrians that are or will be near" the escort. *See id.* § 21-106(a)(2)(iv). It would make little sense for the Legislature to grant police officers extra-jurisdictional authority for the express purpose of facilitating the safe movement of vehicles but then withhold from those officers the precise powers needed to achieve that purpose.

Moreover, the 2013 legislation was intended to assuage police concerns that motorcades would be impracticable if officers could not perform the necessary duties outside of their jurisdictions. To address those concerns, police officers need the authority to do more than simply drive alongside the escorted vehicles; escort duty sometimes requires that officers engage in traffic control or other related tasks. This interpretation is consistent with views expressed by proponents of the 2013 legislation, who expected that the new law would grant officers the "power[] to keep the escort moving and to be able to direct the flow of traffic and pedestrians around the escorts." Hearing on S.B. 621 (written testimony of the Maryland Association of Counties); *see also id.* (written testimony of Baltimore County Police Department) (explaining that the bill would allow officers to "block ramps during the events, and close streets for traffic control as necessary legally").

That said, the statute does not explicitly authorize local police officers to direct traffic outside of their own jurisdictions. It is possible, therefore, a court would disagree and conclude that § 21-106 only grants local officers the power to ride alongside escorts and does not additionally permit them to direct traffic once they have left their home jurisdictions. To the extent that this possibility raises liability concerns, local police agencies could consider seeking clarification from the General Assembly or, as discussed further below, enter into a mutual aid agreement.

We also caution that nothing in the 2013 legislation explicitly or implicitly grants police officers extra-jurisdictional authority to issue traffic citations or make arrests for violations of the Motor Vehicle Law.[9] Given the clear prohibition in CP § 2-102(b)(2) on extra-jurisdictional enforcement of the Motor Vehicle Law, the General Assembly would likely have expressed itself more clearly had it intended to exempt escort-duty officers from that prohibition. In fact, the proponents of the legislation also did not believe that the legislation would "grant broad arrest or enforcement powers to a law enforcement officer performing escort duty outside of the officer's home jurisdiction." Hearing on S.B. 621 (written testimony of the Maryland Association of Counties).

An officer on escort duty surely may arrest individuals for other offenses *not* covered by the Motor Vehicle Law if the officer is acting in accordance with unit regulations and if "an emergency exists," "the police officer is participating in a joint investigation," "rendering assistance to another police officer," or "acting at the request of a police officer or State Police officer." CP § 2-102(b)(3). And the officer may block or direct traffic outside of the officer's jurisdiction while on escort duty and take other similar actions necessary to facilitate the safe movement of vehicles or pedestrians. However, the officer may not issue

---

[9] An officer may enforce the Motor Vehicle Law outside of the officer's jurisdiction when in "fresh pursuit" of a driver who has violated that law, but only when the underlying violation occurred within the officer's jurisdiction. *See* CP § 2-102(b)(4); *see also id.* § 2-301 (defining fresh pursuit); *Seip v. State*, 153 Md. App. 83 (2003).

traffic citations or arrest individuals for violations of the Motor Vehicle Law.[10]

The amendments to § 21-106, as we have interpreted them, appear to give local officers sufficient authority to participate in cross-jurisdictional escorts. We recognize, however, that some of the limits on police authority to enforce the traffic laws may create administrative difficulties for police agencies and the officers who are participating in those escorts. For these reasons, local jurisdictions may wish to seek clarification from the General Assembly or, in the alternative, should enter into "mutual-aid agreements," as authorized by CP § 2-105, to clarify officers' powers during escort duty outside of their home jurisdictions. The prohibition on extra-jurisdictional enforcement of the Motor Vehicle Law does not apply when "the officer is acting under a mutual aid agreement authorized under § 2-105." *See* CP § 2-102(b)(2); 89 *Opinions of the Attorney General* 158, 162-64 (2004). Instead, an officer "coming from one [jurisdiction] to another within the State under [such] a reciprocal agreement . . . may enforce the laws of the State to the same extent as authorized law enforcement officers of the receiving [jurisdiction]." CP § 2-105(g)(1).

There is no doubt that a local jurisdiction may enter into a mutual aid agreement addressing its officers' exercise of extra-jurisdictional powers during police escorts. The governing board of a local jurisdiction has broad authority to enter into a "reciprocal agreement" with other specified jurisdictions to "establish and carry out a plan to provide mutual aid." CP § 2-105(e)(1). And these agreements can cover extended periods of time; jurisdictions need not enter into a separate mutual aid agreement for each escort. *See* 89 *Opinions of the Attorney General* 158 (involving a year-long mutual aid agreement that governed cross-jurisdictional sobriety checkpoints). Although mutual aid agreements were originally available only for "emergencies," the General Assembly has since removed that requirement. *See* 2001 Md. Laws, ch. 188; 89 *Opinions of the Attorney General* at 164. Therefore, a mutual aid agreement is

---

[10] Given these limits on an officer's ability to enforce the Motor Vehicle Law outside of the officer's jurisdiction, law enforcement agencies may wish to consider assigning the task of blocking entrance ramps and intersections to officers with local jurisdiction, who would have the clear authority to cite drivers who disregard such traffic restrictions.

not required, but it may be helpful to define the respective powers and responsibilities of police agencies while on motorcade and escort duty as long as the agreement fulfills the requirements of CP § 2-105.[11]

## B. *Whether SHA and Local Governments May Impose Insurance Requirements for Special Events on Maryland Roads*

Your final question is whether SHA and local authorities may require the organizer of a special event on Maryland roads, such as a motorcycle charity ride, to provide insurance that would cover the organizer and the government authorities involved in managing the event. Such an insurance requirement would serve the dual goals of protecting the government from liability and ensuring that the government and private individuals will have access to a definite pool of money if injuries or property damage occur during the event. We have been advised that SHA and some local jurisdictions already require special event organizers to obtain liability insurance for at least some special events on Maryland roads.

As explained below, we see no State law constraints on the authority of SHA or localities to impose reasonable conditions on permits for the use of roadways under their control. However, there are serious questions about whether a blanket insurance requirement that covers expressive activities, such as parades, assemblies, and perhaps even certain charity events, would violate the First Amendment by imposing an impermissible prior restraint on free speech. At least some form of insurance requirement would probably be constitutional, but we cannot say that any particular insurance requirement affecting expressive activity would withstand judicial scrutiny. An insurance requirement would be more likely to be found constitutional, however, if it includes exceptions for groups that are unable to obtain insurance. Governments may also want to consider whether to narrow the requirement in other ways by, for example, limiting it to pre-defined types of events where injuries are more likely to occur or applying it only to events on *major* highways.

---

[11] These requirements include that the jurisdiction waive claims against the other parties to the agreement arising out of the extra-jurisdictional activities covered by the agreement. CP § 2-105(e)(2)(i).

## 1. The Power of SHA and Local Governments to Require Insurance as a Condition of a Permit Authorizing the Use of Roads for Special Events

State law does not expressly authorize SHA or local governments to require insurance for motorcycle charity rides or for most special events on public roads and highways. One provision requires certain special event applicants to purchase com-prehensive liability insurance, but it applies only to motor vehicle or bicycle racing events. TR § 21-1211(b)(2) (requiring the sponsors of a motor vehicle or bicycle racing event on a highway or a highway bridge to "[i]ndemnify the State and local governments from any loss arising out of or relating to the racing event" and "[p]rovide comprehensive liability insurance, in an amount to be determined by the [SHA] or local authority . . . for the benefit of the State and local governments, spectators, and other highway [users]").[12]  In fact, for the most part, State law does not explicitly authorize SHA and local governments to establish permitting schemes for special events on public roads. Organizers of motor vehicle, bicycle, and foot racing events must obtain the permission of SHA or a local authority, *see* TR §§ 21-1211, 21-1211.1, but, otherwise, we are not aware of any other express statutory permit requirements for special events.

Nonetheless, we believe that SHA and local jurisdictions have implied authority to establish permitting schemes for the use of Maryland roads under their jurisdiction for special events and, accordingly, the power to impose reasonable conditions—such as insurance—on that use.  This implied authority flows from different sources for SHA, charter counties, code counties, and commissioner counties, but, for the reasons explained below, each source authorizes the establishment of permitting schemes that would allow the relevant jurisdiction to require insurance as a reasonable permit condition.

---

[12] The General Assembly's decision to impose an explicit insurance requirement for motor vehicle racing events does not mean that the Legislature intended to foreclose SHA or local jurisdictions from requiring insurance for other special events on State roads.  The legislative history of § 21-1211 makes clear that the relevant provisions of the statute were enacted in response to a specific request by a group of private citizens for a motor vehicle race in Allegany County. *See* Fiscal & Policy Note, S.B. 984 (2007).  When considering that bill, therefore, the General Assembly had no reason to decide whether similar insurance requirements were permitted in other contexts.

SHA's authority to require a permit for special events on State roads emanates from several sources of law. In addition to its express statutory authority over foot races and motor vehicle races, SHA may prohibit the use of controlled access highways "by parades, low speed vehicles, funeral processions, bicycles, or other nonmotorized traffic or by any person operating a motorcycle." TR § 21-313(a). Because the power to prohibit includes the power to regulate, *see Cahen v. Jarrett*, 42 Md. 571, 576-77 (1875), the agency may establish a permitting scheme to govern the circumstances under which such uses might be allowed.[13]

Moreover, with respect to other roads, SHA has been "vested [by the Legislature] with powers of control and regulation over the public highways," *Goldsborough v. Postal Tel. Cable Co.*, 123 Md. 73, 76 (1914), and has "plenary power" to maintain the State's system of highways, *Contino v. Baltimore & Annapolis R. Co.*, 178 F.2d 521, 523 (4th Cir. 1949).[14] Where, as here, "the General Assembly has bestowed upon an agency a broad delegation of power, [courts] liberally construe the scope of that agency's implied powers." *Thanner Enters., LLC v. Baltimore County*, 414 Md. 265, 279 (2010). This plenary power over State roads, therefore, includes the implied power to regulate the use of the roads for special events. And, as a practical matter, participants in special events will often need permission from SHA because they might otherwise be violating provisions of the Maryland Vehicle Law that require drivers to obey all traffic control devices, TR § 21-201(a), and forbid pedestrians from walking on the roadway, TR § 21-506.

---

[13] *See also Nollan v. California Coastal Comm'n*, 483 U.S. 825, 836 (1987) (stating that the power to forbid construction "must surely include the power to condition construction"); *Ticonderoga Farms, Inc. v. County of Loudoun*, 242 Va. 170, 174, 409 S.E.2d 446 (1991) (stating that "the power to prohibit includes the power to regulate").

[14] Although *Goldsborough* and *Contino* dealt with the State Roads Commission and not SHA, the State Roads Commission became part of the Department of Transportation in 1971 and most Commission duties were assumed by the State Highway Administration at that time. 1970 Md. Laws, ch. 526 (Art. 41, § 207F); *see* Maryland Manual, "Department of Transportation," available at http://msa.maryland.gov/msa/mdmanual/24dot/html/dot.html#highway (last visited Apr. 28, 2014).

Having concluded that SHA has the authority to establish a permitting scheme, we have little doubt that it may also require insurance as a reasonable condition on the grant of such a permit. *See County Council for Montgomery County v. Lee*, 219 Md. 209, 215 (1959) (stating that the right to withhold permission to pave roadway "carries with it the right to prescribe reasonable terms and conditions upon which the permit would issue"). SHA, therefore, may require insurance for special events on State roads.[15]

A similar analysis applies to local governments, which also have "implied authority to exercise 'such powers as are necessary in the performance of a duty imposed or the accomplishment of a stated purpose . . . .'" 98 *Opinions of the Attorney General* 60, 74 (2013) (quoting *Barlow v. Friendship Heights Citizens' Comm.*, 276 Md. 89, 95 (1975)); *see also County Comm'rs v. Supervisors of Elections*, 192 Md. 196, 211 (1949) (counties have "implied authority to exercise all such powers as may be necessary or fairly implied in or incident to the enjoyment and exercise of their express powers"). Like SHA, local governments that have the authority to adopt traffic regulations, *see* TR § 11-130, may regulate races on their roads as well as prohibit parades and nonmotorized traffic on controlled access highways, *see* TR §§ 21-313, 21-1211, 21-1211.1. And, with respect to other types of events on other types of local roads, the Motor Vehicle Law explicitly recognizes that "a local authority, in the reasonable exercise of its police power," may "[r]egulat[e] or prohibit[] processions or assemblies on highways." TR § 25-102(a)(3). Although this recognition is part of a provision that exempts certain local police powers from preemption by the Maryland

---

[15] The Maryland Declaration of Rights provides that "no aid, charge, tax, burthen or fees ought to be rated or levied, under any pretense, without the consent of the Legislature." Md. Decl. of Rights Art. 14. We recognize that an insurance requirement could be viewed, in the abstract, as a "burthen" because it places a state-imposed burden on a permit application to acquire insurance. *See Benson v. State*, 389 Md. 615, 634 (2005) (explaining that "burthen" in Article 14 should be read synonymously with the current definition of burden). However, we doubt that Article 14 is targeted at regulatory measures—like an insurance requirement—which may incidentally require a group to pay money to someone other than the government. The Court of Appeals has characterized Article 14 as "encompass[ing] a wide variety of payments *to the government*," *id.* at 635 (emphasis added), and we are not aware of any instance where the rule has been applied to regulatory measures of this type.

Vehicle Law, it strongly implies that the General Assembly believed localities already had the power to regulate the use of highways for special events.[16]

Indeed, counties have long had control and jurisdiction over their roads, *see*, *e.g.*, *Queen Anne's Conservation, Inc. v. County Comm'rs*, 382 Md. 306, 323 (2004) (explaining that county commissioners can, among other powers, "control county property and roads"); *Jenkins v. Riggs*, 100 Md. 427 (1905); *Gaither v. Watkins*, 66 Md. 576 (1887), and the Express Powers Act provides the counties with significant regulatory powers over the roads within their jurisdictions.[17] Both charter and code counties, for example, have explicit authority to enact laws "relating to" the "use of streets and highways." LG § 10-317(a)(1).[18] And, although commissioner counties do not have comprehensive police powers, the General Assembly has expressly provided that "[t]he governing body of a county has control over county roads." LG § 12-503(b). The county commissioners, therefore, have a "duty . . . to keep the public roads in a safe condition" and are liable for "the existence of dangerous obstructions upon them." *Godwin v. County Comm'rs*

---

[16] Although the Motor Vehicle Law prohibits local governments from "[i]mpos[ing] on the owner or driver of any vehicle any tax, registration fee, license fee, assessment, or charge of any kind for the use of a vehicle on any highway in this State," TR § 25-101.1(b)(2), we do not think that this prohibition would prevent a local government from imposing an insurance requirement on a special event. Special event insurance is not imposed on particular drivers or particular vehicles but, rather, for the event as a whole. And, in any case, the Motor Vehicle Law excludes from its preemptive reach any law "[r]egulating or prohibiting processions or assemblies on highways." TR § 25-102(a)(3).

[17] Because the requesters of this opinion are counties, we focus here on county powers. But we note that municipalities have broad police powers to "preserve peace and good order," "secure persons and property from danger and destruction," and "protect the health, comfort, and convenience of the residents of the municipality." Md. Code Ann., Local Gov't ("LG") § 5-202. These police powers would seem to encompass the authority to regulate the use of roads for special events.

[18] The Baltimore City Charter similarly grants the City the power "[t]o regulate the use of streets and public ways by persons, animals and vehicles." *See* Baltimore City Charter Art. 1, § 34(d).

*of St. Mary's County*, 256 Md. 326, 335-36 (1970) (quoting *County Comm'rs of Baltimore County v. Wilson*, 97 Md. 207, 210 (1903)). In light of the commissioners' control over county roads in general and their specific duty to prevent injuries on public roads, we suspect that the General Assembly also intended to confer on commissioner counties the implied power to exercise control over when, and under what circumstances, special events could create an "obstruction" on county roads. While clarification from the Legislature on this point might be useful, it appears that all localities have the power to regulate special events on roads under their control.[19] And, as explained above, these powers also carry with them the right to prescribe reasonable terms and conditions on the use of their roads, including a requirement that event sponsors provide proof of liability insurance for the event. *See Lee*, 219 Md. at 215.

### 2. The Constitutionality of Insurance Requirements Under the First Amendment

The more difficult question is whether an insurance requirement would violate the First Amendment by placing an impermissible burden on groups seeking to hold special events on State roadways.[20] Although many motorcycle charity rides might

---

[19] In crafting insurance requirements, localities should be aware that the Court of Appeals has placed certain limits on the authority of counties to enact laws that have significant effect outside the county and, hence, are not "local." *See* 96 *Opinions of the Attorney General* 139, 159-60 (2011) (gathering and explaining Court of Appeals decisions on this issue). We recognize that someone could argue that an insurance requirement covering multi-jurisdictional events (like a motorcycle charity ride) could exceed a local government's authority to take measures that are "local." However, the control of county roads has long been viewed as a local matter. *See*, *e.g.*, LG § 12-503(b); *Jenkins*, 100 Md. at 436. We doubt that a court would question a county's authority to impose reasonable conditions on permits for the use of roads under their control or conclude that the extra-territorial effect of such a restriction is significant enough to invalidate the law. *See Holiday Universal v. Montgomery County*, 377 Md. 305, 308, 315 (2003) (invaliding law only where the extra-territorial effect was "significant" and "substantial").

[20] The Maryland Declaration of Rights similarly prevents the State from placing impermissible burdens on free speech. Md. Decl. of Rights, Art. 40. The Court of Appeals has instructed that, while Article 40 is generally treated as *in pari materia* with the First Amendment, the two provisions are capable of independent interpretation. *See Pack Shack v. Howard County*, 377 Md. 55, 64 n.3 (2003). Because we do

not involve expressive activity protected by the First Amendment, some probably will. And, in any case, you asked more broadly about insurance requirements for "special events" on Maryland roads, which could encompass parades, marches, and other conduct that is clearly protected by the First Amendment. In considering this issue, therefore, we assume that your hypothetical insurance requirement will cover at least some special events that involve expressive activities and that the requirement will apply to at least some roads that constitute "traditional public forums" where the Supreme Court has found that First Amendment protections are at their strongest. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (explaining that the state's right to limit expressive activities in "streets and parks" is "sharply circumscribed").

As we explained in an earlier opinion, insurance requirements for special events in traditional public forums are constitutionally suspect because speakers with controversial views might find it more difficult and expensive to obtain insurance, and these obstacles could deter (or effectively bar) some speakers from holding events involving controversial speech. *See* 78 *Opinions of the Attorney General* 75, 83-84 (1993). According to the Supreme Court, permit requirements for special events that involve protected speech are considered "prior restraints," which are presumptively unconstitutional under most circumstances. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

Permit schemes, however, are permissible so long as they constitute valid time, place, and manner regulations. *See*, *e.g.*, *id.*; *Cox v. New Hampshire*, 312 U.S. 569, 574-76 (1941). This is true even where a permit scheme imposes some sort of monetary condition (like an application fee) on the issuance of the permit. *See*, *e.g.*, *Forsyth County*, 505 U.S. at 130; *Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007); *Stonewall Union v. City of Columbus*, 931 F.2d 1130 (6th Cir. 1991). A law or policy regulating speech in a public forum constitutes a valid time, place, and manner regulation if it (1) is content-neutral; (2) is "narrowly tailored to serve a significant government interest"; (3) "leave[s] open ample alternatives for communication"; and (4) does not

---

not see a textual or precedential basis for an independent interpretation of Article 40 in this context, and because the First Amendment case law is much more developed, our analysis will follow the federal model.

"delegate overly broad . . . discretion to a government official" in determining whether to grant a license or impose a monetary condition. *Forsyth County*, 505 U.S. at 130; *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002).

We are not aware of any Supreme Court case, Fourth Circuit case, or Maryland case applying this test to insurance requirements for special events on roads, parks, or other public property. This lack of binding authority makes it difficult to definitively conclude that a particular insurance requirement will pass constitutional muster or, alternatively, will fail to meet the necessary standards. However, a number of opinions from other courts provide helpful guidance about how to analyze the constitutionality of insurance requirements. As a whole, these opinions illustrate that insurance requirements are suspect but are probably constitutional in at least some form. These opinions also show that taking certain steps to limit the requirement's scope— such as providing exceptions for indigents, other groups unable to obtain insurance, and events unlikely to pose a risk of injury or property damage—make it more likely that such a requirement will be upheld.

### a.    Content Neutrality

The threshold question under the time, place, and manner test is whether an insurance requirement is content-neutral. *See Forsyth County*, 505 U.S. at 130. Most laws mandating insurance for special events are *facially* content-neutral. They do not require different amounts of insurance coverage depending on the speaker or the subject matter of the event or draw other explicit distinctions based on content. As a result, some courts have concluded, on the facts before them, that government-imposed insurance requirements are content-neutral. *See*, *e.g.*, *Camp Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1282 (11th Cir. 2006) (upholding insurance requirement for festivals with over 10,000 attendees); *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000) (finding liability insurance requirement constitutional when "[t]he required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved"), *aff'd on other grounds by*, 534 U.S. 316 (2002); *Gerristen v. City of Los Angeles*, 994 F.2d 570, 578-79 (9th Cir. 1993) (upholding insurance requirement for use of government-owned bandstand and sound system).

Other courts, however, have concluded that insurance requirements might in practice impose greater burdens on certain speakers based on the content of their message because private

insurers "inevitably evaluate the content of a group's speech when setting the rate for an insurance policy." *iMatter Utah v. Njord*, ___ F. Supp. 2d ___, 2013 U.S. Dist. LEXIS 158371, at *22 (D. Utah 2013) (evaluating Utah's policy requiring insurance for all special events on state roads), *appeal docketed*, No. 13-4173 (10th Cir. Dec. 5, 2013). These courts point out that "private insurers are likely to apply content-, speaker-, and viewpoint-based criteria when determining whether to offer event liability insurance and, if so, how much to charge." *Id.* at *23; *see also Eastern Conn. Citizens Action Grp. v. Powers*, 723 F.2d 1050, 1056 n.2 (2d Cir. 1983) (observing that, in deciding whether to provide insurance for special events, "brokers or underwriters often consider political beliefs of those who have applied"); *Van Arnam v. Gen. Servs. Admin.*, 332 F. Supp. 2d 376, 396-97 (D. Mass. 2004);[21] Eric Neisser, *Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas*, 74 Geo. L.J. 257, 272-78 (1985) (explaining the insurance market in this context). As a result, "courts have commonly acknowledged that insurance requirements can indirectly restrict speech on the basis of its content." *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1050 (9th Cir. 2005) (Berzon, J., dissenting).

The fact that the cost of insurance might depend on the content of the speech necessarily raises questions about whether an insurance requirement can *ever* be content neutral. Courts are split on this question. Ordinarily, "a facially content-neutral regulation . . . cannot be deemed constructively content-based on the basis of its effects." *Van Arnam*, 332 F. Supp. 2d at 399. The "touchstone" for determining content-neutrality is instead the government's purpose in enacting the restriction. *Id.* Along these lines, "[a] regulation that serves purposes unrelated to the content

---

[21] *Van Arnam* did not involve an insurance requirement, but a requirement that permittees agree to *indemnify* the government from damages arising out of the event. Nevertheless, the court effectively treated the indemnification requirement as an insurance requirement, reasoning that it forced any rational permittee to purchase insurance. *See* 332 F. Supp. 2d at 392-93. Other courts, however, have not treated the two issues as identical. Although we focus solely on insurance in this opinion, governments should note that some courts have found that indemnification requirements—depending on how they are structured—may also pose problems under the First Amendment. *See, e.g.*, *id.* at 401-03.

of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Norton v. Ashcroft*, 298 F.3d 547, 553 (6th Cir. 2002) ("[T]here is no disparate impact theory under the First Amendment."). Because the primary purposes of an insurance requirement are to protect the government from financial liability and to provide a pool from which injured participants and spectators can obtain compensation—neither of which has anything to do with content—numerous courts have concluded that such a requirement is content-neutral.[22] *See, e.g., Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1030 (9th Cir. 2008); *Food Not Bombs*, 450 F.3d at 1057 (Kleinfeld, J., writing for the majority); *iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *22-28; *Van Arnam*, 332 F. Supp. 2d at 396-400.

Nonetheless, a number of other courts have relied on the Supreme Court's decision in *Forsyth County* to reach the opposite conclusion that an insurance requirement is inherently content-based. *See, e.g., Nationalist Movement v. City of York*, 481 F.3d 178, 185 (3d Cir. 2007) (striking down a requirement that special event applicants reimburse the costs of policing an event because the provision was the "flip side" of an insurance requirement, which would also be unconstitutionally content-based); *Steele v. City of Bemidji*, 257 F.3d 902, 908 (8th Cir. 2001) (invalidating an insurance requirement for solicitation on public property); *Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach*, 14 Cal. App. 4th 312, 340 (Ct. App. 1993); *see also Food Not Bombs*, 450 F.3d at 1050-51 (Berzon, J., dissenting). In *Forsyth County*, the Supreme Court held that a facially content-neutral ordinance requiring permit holders to pay a fee for police protection was effectively content-based because the government "must necessarily examine the content of the message" to

---

[22] Of course, if the plaintiff can demonstrate an "ulterior content-based purpose," the result would probably be different. *See Van Arnam*, 332 F. Supp. 2d at 399; *see also Collin v. Smith*, 578 F.2d 1197, 1208 & n. 20 (7th Cir. 1978) (holding that insurance requirement was content-based where the Ku Klux Klan was unable to obtain insurance and noting that the government had exempted from the requirement parades that it had regarded as "acceptable"); *Invisible Empire of the Knights of the Ku Klux Klan v. Mayor of Thurmont*, 700 F. Supp. 281, 284-85 (D. Md. 1988) (noting the town had imposed an insurance requirement and other permit conditions on the KKK but not on the volunteer firefighters and the Catoctin High School homecoming parade).

determine "the amount of hostility likely to be created" and "assess accurately the cost of security." 505 U.S. at 134 (internal quotation marks omitted). Although the government argued that the regulation had a content-neutral purpose of recouping costs for maintaining public order, the Court explained that, "in this case, it cannot be said that the fee's justification 'has nothing to do with content.'" *Id.* (quoting *Ward*, 491 U.S. at 792). The Court found that the purportedly content-neutral purpose was instead "associated with the public's reaction to the speech," and held that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Id.; see also id.* at 134-35 ("Speech cannot be financially burdened any more than it can be punished or banned, simply because it might offend a hostile mob.").

An insurance requirement arguably creates the same risk of imposing an impermissible "heckler's veto" based on the expected reaction of a "hostile mob." As one court has observed, the "delegation of the amount of insurance charges to the market . . . appears inescapably to create a system of charges subject to impact and adjustment based on 'content,'" including whether there is likely to be a hostile reaction to the applicant's speech. *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 340; *see also Food Not Bombs*, 450 F.3d at 1050-52 (Berzon, J., dissenting). Indeed, in an earlier opinion, we explicitly concluded that *Forsyth County* "would prohibit application of a bonding or insurance requirement that applies to damages caused by hostile crowds." 78 *Opinions of the Attorney General* at 83-84.

However, cases decided after our earlier opinion highlight important distinctions between the security fee in *Forsyth County* and an insurance requirement. The security fee in *Forsyth* was imposed "[a]s a direct result" of two demonstrations involving controversial issues where counter-demonstrators threw rocks and beer bottles. *Forsyth County*, 505 U.S. at 126 (internal quotation marks omitted). It was therefore clear that the fee was specifically intended to fluctuate based on the content of—and likelihood of a hostile reaction to—an applicant's speech. With an insurance requirement, however, it is not clear that the government intends content to be a driving factor. Rather, the government is "merely" attempting to "protect[] [itself] from liability in the conventional manner of any property owner." *Food Not Bombs*, 450 F.3d at 1058 (Kleinfeld, J., writing for the majority). Moreover, Forsyth County's ordinance required government officials to assess the content of the speaker's message and charge a different fee based on that assessment,

whereas the government "does not provide insurance and thus has no influence on the cost of insurance required for any particular event." *ASU Students for Life v. Crow*, 2008 U.S. Dist. LEXIS 18698, *43-44 n.2 (D. Ariz. 2008), *vacated in part on other grounds*, 357 Fed. Appx. 156 (9th Cir. 2009). To the extent that private insurers take content into account when setting rates, it is not clear that such a downstream, unintended consequence can be attributed to the government. *See iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *27 (citing *Ward*, 491 U.S. at 791); *Van Arnam*, 332 F. Supp. 2d at 399.

Given the distinctions between *Forsyth County* and your hypothetical insurance requirement, we tend to agree with the court in *iMatter Utah* that "there is insufficient precedent for holding that a regulation that is content-neutral on its face can become content-based by indirectly importing unidentified third-party insurers' decisions to place a greater burden on controversial speech." 2013 U.S. Dist. LEXIS 158371 at *26. But it is certainly possible that a court could apply *Forsyth County* to this context and classify an insurance requirement as content-based. *See* 78 *Opinions of the Attorney General* at 83-84 (explaining that "some courts have held . . . insurance requirements generally invalid" because of their effect on controversial speech).

There are, however, ways in which a government might craft an insurance requirement to reduce the possibility that a reviewing court would find it content-based. For example, it might be prudent to include an exception to an insurance requirement for entities that can demonstrate that, because of their views, they are unable to obtain insurance. At least one court has held—and a few more have implied—that insurance requirements are sufficiently content-based that they may be unconstitutional as applied to applicants who are unable to obtain insurance because of their controversial views. *See Collin v. Smith*, 578 F.2d at 1208-09 (holding that insurance requirement was content-based where KKK unable to obtain insurance); *Mayor of Thurmont*, 700 F. Supp. at 285 (finding insurance requirement unconstitutional for numerous reasons, including fact that KKK could not obtain insurance); *iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *28 (noting that an insurance requirement "risks a future legal challenge from a group with a controversial message whose First Amendment activity is totally prohibited because no third-party insurer is willing to provide the group with the required special event insurance coverage"). Inclusion of this type of waiver,

therefore, would likely improve the chances that an insurance requirement withstands constitutional scrutiny.

Limiting the insurance requirement to losses caused by the acts of the permittee and persons acting under the permittee's authority, and *not* for the acts of bystanders and counter-demonstrators, might be another option, if such coverage is available in the private insurance market. Such a change may not be necessary—and it would have the adverse effect of diminishing the protection afforded to the government by the insurance requirement—but it could increase the likelihood that the policy would be upheld.[23]

### b.   Narrow Tailoring

Under the second prong of the time, place, and manner test, an insurance requirement must be "narrowly tailored to serve a significant government interest." *Forsyth County*, 505 U.S. at 130. "[T]he requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" and the government does "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Although a regulation "need not be the least restrictive or least intrusive means" of serving the government's significant interest, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* at 798-99.

---

[23] This change might also be helpful for another reason. In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the Supreme Court held that nonviolent protestors could not be held liable under tort law for the violent actions of persons over which they had no control merely because they were part of the same organization. In other words, "[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence." *Id.* at 920. Although it does not appear that any court has applied this rule to invalidate an insurance requirement that covered actions by third parties, *see*, *e.g.*, *iMatter Utah*, 2013 U.S. Dist. LEXIS 158371, at *38-39 (declining to decide whether *Claiborne* should be extended to insurance), some courts have applied the rule to invalidate indemnification clauses that required permittees to pay for all injuries caused by opponents and bystanders. *See Long Beach Area Peace Network*, 522 F.3d at 1039-40.

A majority of the cases to consider this issue have done so only with respect to as-applied challenges by indigent groups that could not afford insurance. *E.g.*, *E. Conn. Citizens Action Grp.*, 723 F.2d at 1053, 1056-57; *Coe v. Town of Blooming Grove*, 567 F. Supp. 2d 543, 564-66 (S.D.N.Y. 2008); *Wilson v. Castle*, 1993 U.S. Dist. LEXIS 9726, at *4 (E.D. Pa. 1993); *Mayor of Thurmont*, 700 F. Supp. at 285-86. In that context—where the insurance requirement effectively precludes the plaintiff from receiving a permit—courts have held that "[w]hatever marginal benefit the [government] might derive from choosing not to exempt indigent persons from its insurance requirement does not justify the very substantial burden" on the free speech rights of people with limited financial means.[24] *Coe*, 567 F. Supp. 2d at 566.

We recognize that there are reasonable arguments against requiring indigence waivers for insurance requirements. In a similar context, for example, the First and Sixth Circuits have held that indigence waivers for parade application fees are not required if permit applicants have other alternatives for expressing their views, including marching on sidewalks. *Sullivan*, 511 F.3d at 42; *Stonewall Union*, 931 F.2d at 1137. And indigence waivers appear to undermine at least one of the significant governmental interests advanced by an insurance requirement, which is to ensure that a definite pool of money exists from which a victim can recover when a defendant does not have the means to pay tort damages. *See Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 341. Exempting indigent groups from such a requirement would thus make the provision more narrowly tailored in one way but less narrowly tailored in another. However, no court has extended *Sullivan* and *Stonewall* to the insurance context, *see*, *e.g.*, *iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *42 (declining to do so), and it does not appear that any court has discussed the latter issue. The safest route to ensure the

---

[24] Some of these courts applied the incorrect standard by requiring the government to show that the insurance requirements were "necessary" or constituted the "least restrictive means" of achieving the government's goals. *See E. Conn. Citizens Action Grp.*, 723 F.2d at 1053, 1055-57; *Mayor of Thurmont*, 700 F. Supp. at 285 (stating that the town had "made no showing that insurance or a hold harmless agreement is even necessary"). As the Supreme Court made clear in *Ward*, this is not the test. *See* 491 U.S. at 798-99. However, given the substantial burden on indigents' First Amendment rights, we suspect these courts probably would have come to the same conclusion under the correct standard.

constitutionality of an insurance requirement, therefore, may be to include a waiver for indigent applicants.

Determining whether an insurance requirement could survive a *facial* challenge from a group that can afford insurance is more complicated. The Second Circuit in *Eastern Connecticut Citizens Action Group* took care to clarify that an insurance requirement might "be valid when reasonably applied." 723 F.2d at 1057; *see also Houston Peace Coalition v. Houston City Council*, 310 F. Supp. 457, 462-63 (S.D. Tex. 1970) (invalidating insurance requirement on other grounds but noting that "it is certain" the city could impose one). And, in fact, some insurance requirements have been upheld as narrowly tailored when there appears to be some special need for insurance. *See Camp Legal Defense Fund*, 451 F.3d at 1282-83 (festivals over 10,000 people); *Gerristen*, 994 F.2d at 578-79 (government-owned electronic equipment). But, as we explain below, broad insurance requirements akin to your hypothetical requirement for all "special events on State roads" have not fared very well even when the court has not expressly relied on a determination that the plaintiff was indigent. *See iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *32-56 (invalidating requirement without determining whether the plaintiff was indigent); *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 342 (invalidating requirement as applied to all parades). Although such insurance requirements are not clearly unconstitutional, governments must tread carefully and—if they desire safer constitutional ground—may want to consider crafting more limited requirements that apply only when there is a particular need for insurance.

In reaching this conclusion, we first consider whether an insurance requirement advances any "significant government interest[s]." The government has a significant interest in protecting itself from potential liability, *e.g.*, *E. Conn. Citizens Action Grp.*, 723 F.2d at 1056, protecting its property, *e.g.*, *Van Arnam*, 332 F. Supp. 2d at 401, ensuring public safety, *e.g.*, *id.*, and "furnish[ing] a pool of financial coverage for injuries" to individual participants and spectators, *e.g.*, *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 341. With respect to the government's purported interest in public safety, however, it is not obvious that an insurance requirement will "have any effect on the likelihood that some sort of accident will occur during the event." *iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *31; *see also Van Arnam*, 332 F. Supp. 2d at 401 (reaching a similar conclusion); *but see Urlaub v. Village of Belport*, 498 F. Supp. 2d

614, 621 (E.D.N.Y. 2007) (stating, without explanation, that insurance provision was "relevant" to public safety). The focus of an insurance requirement is instead on guaranteeing that someone other than the taxpayers will provide a pool of money to pay any claims should accidents occur. *See iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *31.

An insurance requirement certainly promotes these primary government interests. There is no doubt that an insurance requirement protects the government from liability and provides a pool of money to compensate victims for injuries. Special events—particularly ones that involve large crowds or dangerous activities—can subject participants to considerable risk of injury and, accordingly, subject governments to considerable risk of liability for those injuries.

Despite these legitimate governmental interests, courts have been reluctant to uphold insurance requirements against First Amendment challenges when the government has other options for limiting its liability exposure. Many governments already have general liability insurance or enjoy caps on their liability, as provided by tort claims legislation. *See*, *e.g.*, *Mayor of Thurmont*, 700 F. Supp. at 285; *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 340. Similarly, if an event involves motor vehicles, those vehicles may already be covered by private insurance. *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 341; *see also* Neisser, 74 Geo. L.J. at 305. And the government can also significantly reduce the probability of any injuries or property damage by ensuring that the event takes place in a safe location with an adequate police presence, working with the applicant to minimize risks to public safety, and enforcing laws that criminalize dangerous conduct. *See*, *e.g.*, *Coe*, 567 F. Supp. 2d at 567; *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 341. These alternative methods to avoid liability may be particularly useful where the event itself involves little risk or there is no history of injury from similar events. *See E. Conn. Citizens Action Grp.*, 723 F.2d at 1056-57 (explaining that the burden on indigent groups was particularly overbroad because there was no evidence that the type of special event at issue posed a serious risk of injury or that anyone had previously been injured during an event); *Wilson*, 1993 U.S. Dist. LEXIS 9726, at *10 (same).

With this background in mind, a court could reasonably find that an insurance requirement "burden[s] substantially more speech than is necessary to further the government's legitimate interests" in protecting itself and its citizens, *Ward*, 491 U.S. at 798-99, especially where the type of event at issue does not pose a

significant risk of harm or the government can protect itself from liability in other ways, *see iMatter Utah*, 2013 U.S. Dist. LEXIS 158371 at *32-56; *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 340-41. In *iMatter Utah*, for example, the court emphasized that Utah's policy applied across the board even when the event posed few risks and that Utah simply "assume[d] that the ordinary mechanisms for protecting itself from liability will fail" without considering alternative means of achieving its goals. 2013 U.S. Dist. LEXIS 158371 at *56; *see also id*. at *33-36.

That said, a court would not be compelled to accept this rationale or hold that any broad insurance requirement is unconstitutional. A regulation "need not be the least restrictive or least intrusive means" of serving the government's significant interest. *Ward*, 491 U.S. at 798. Moreover, the cases invalidating insurance requirements arguably fail to give sufficient weight to the government's interest in ensuring that a definite pool of money exists to compensate the government or private individuals for their injuries. (In fact, it does not appear that *iMatter Utah* discussed this interest at all, focusing only on the government's interest in protecting *itself* from financial liability.) And the cases perhaps place too much faith in the government's ability to prevent accidents through policing, site selection, and other means. In 1985, for example, a Marylander was paralyzed in an Annapolis charity "bed race" when her bed hit a curb, makeshift wheels broke off, and she flew into a light pole. *See* Associated Press, *Rider in Bed Race Injured*, N.Y. Times, Aug. 27, 1985, available at http://www.nytimes.com/1985/08/27/us/rider-in-bed-race-injured.html (last visited May 22, 2014). We doubt that additional police coverage could have prevented her injuries. But the fact remains that there is a significant risk that a court would invalidate a broad insurance requirement unless the government demonstrates that it has considered alternatives to insurance where possible and has placed some limits on the scope of the requirement.[25] A government must be aware of this risk when it

---

[25] We do not, however, think that this analysis raises any serious questions about the constitutionality of TR § 21-1211(b)(2), which requires insurance for motor vehicle and bicycle races on Maryland roads. We doubt that many—if any—such races will include expressive activity that implicates the First Amendment. And, even if they do, races involve clear risks of injury for which insurance may be necessary, but which may not be covered by a standard motor vehicle insurance policy.

crafts a broad insurance requirement that covers all, or substantially all, special events.

Conversely, an insurance requirement is likely to be upheld as narrowly tailored where it is targeted toward specific risks or more dangerous events. The Ninth Circuit, for example, upheld an ordinance that required applicants to post an insurance bond for the use of an expensive government-owned bandstand and sound system for a special event. *Gerristen*, 994 F.2d at 578-79. And the Eleventh Circuit upheld an insurance requirement that applied to all festivals with over 10,000 estimated attendees. *Camp Legal Defense Fund*, 451 F.3d at 1282-83. In light of these cases, insurance requirements will likely be treated more favorably when there is a specific risk of harm to government property or event participants, or (as with very large groups) the events might pose significant risks even with adequate safety precautions. Governments interested in employing mandatory insurance requirements, therefore, should at least consider providing exceptions for events that do not pose significant risks of liability or limiting their insurance requirement to a narrower class of special event where the need for insurance is more clear.[26]

Another solution might be to craft an insurance provision that gives permit applicants a choice about how to avoid liability for injuries and property damage. For example, the Ninth Circuit has upheld an ordinance that required insurance for non-expressive events but, for expressive events, gave permit applicants the choice to (1) purchase insurance, (2) agree to indemnify the government, or (3) "agree to redesign or reschedule the permitted event to respond to specific risks, hazards and dangers to the public health and safety identified by the city manager as being reasonably foreseeable consequences of the permitted [event]." *Long Beach Area Peace Network*, 522 F.3d at 1029; *see also Food Not Bombs*, 450 F.3d at 1057 (Kleinfeld, J.) (upholding similar insurance policy). Although the court did not explicitly discuss whether these ordinances were narrowly tailored, the availability of an option to redesign or reschedule the event in light of "specific risks" alleviates most of the concerns expressed by courts that have rejected insurance requirements as

---

[26] As discussed below, however, these exceptions must have adequate content-neutral criteria to ensure that administrators do not have overly broad discretion in determining when the insurance requirement will apply.

overly broad, and we suspect that an insurance plan like this one would satisfy this element of the time, place, and manner test. *See iMatter Utah*, 2013 U.S. Dist. LEXIS 158371, at *45-46 (distinguishing *Long Beach Area Peace Network* and *Food Not Bombs* as non-mandatory). To be sure, giving applicants the *option* of obtaining insurance does not provide the government with as much protection as a mandatory insurance requirement, but a government could consider this approach if it wishes to steer more clearly around the constitutional pitfalls we discuss above.

### c.     Alternatives for Communication

The third element of the time, place, and manner test is whether the relevant restriction "leave[s] open ample alternatives for communication." *Forsyth County*, 505 U.S. at 130. "In order to satisfy this standard, the available alternatives need not 'be the speaker's first or best choice' or 'provide[] the same audience or impact for the speech.'" *Ross v. Early*, __ F.3d __, 2014 U.S. App. LEXIS 4161, *30-31 (4th Cir. 2014) (quoting *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)). "Rather, the relevant inquiry is simply whether the challenged regulation 'provides avenues for the more general dissemination of a message.'" *Id.* at *31 (quoting *Green v. City of Raleigh*, 523 F.3d 293, 305 (4th Cir. 2008)) (internal quotation and citation omitted).

As far as we can tell, no court has invalidated an insurance requirement on this ground. Even for speakers who cannot afford the insurance, a restriction on the use of State roads still leaves open numerous alternative locations for similar speech activity, including parks, sidewalks, and medians. *See*, *e.g.*, *Sullivan*, 511 F.3d at 42 (finding ample alternatives in context of permit application fee for events on city streets); *Stonewall*, 931 F.2d at 1137 (same). We recognize that a park or sidewalk does not provide all the same advantages as a street; parks do not allow for mobile events (like parades), and sidewalks accommodate "fewer marchers," reducing the impact of the speech and the number of people who can participate. *Sullivan*, 511 F.3d at 51 (Lipez, J., dissenting); *see also iMatter Utah*, 2013 U.S. Dist. LEXIS 158371, at *66-69. But, as the First Circuit explained in *Sullivan*, sidewalks and parks are adequate alternatives to street marches even if they reduce the "potential audience" because they still allow for "the general dissemination of [the speaker's] message." 511 F.3d at 42-44 (internal quotation marks omitted); *see also Ross*, 2014 U.S. App. LEXIS 4161, *30-31 (holding that an

alternative is adequate even if it does not "provide[] the same audience or impact for the speech").

Therefore, assuming that insurance is not required for speakers to use one of these other avenues for expression, an insurance requirement likely satisfies this element. Although a plaintiff could theoretically raise an as-applied challenge where, for some reason, use of State roads would be "an essential part of the message sought to be conveyed" or "essential to communicating with the intended audience," *Van Arnam*, 332 F. Supp. 2d at 395 (quoting *Nationalist Movement v. City of Boston*, 12 F. Supp. 2d 182, 192 (D. Mass. 1998)), we doubt that many messages would *require* the use of State roads. At least under most circumstances, therefore, an insurance requirement for special events on public roads would leave ample alternatives for communication.

### d. Standards for Exercise of Official Discretion

Finally, a valid insurance requirement cannot "delegate overly broad . . . discretion to a government official." *Forsyth County*, 505 U.S. at 130. Otherwise, there is a risk that the official could use that broad discretion to "favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323. A time, place, and manner regulation must therefore contain "adequate standards to guide the official's discretion." *Id.* These standards need not be "rigid[]," *see id.* at 325, but they also cannot leave the decision "to the whim of the [official]," *Forsyth County*, 505 U.S. at 133. For instance, in *Forsyth County*, the Court rejected an administrative fee provision where there were "no articulated standards" about "how much to charge . . . or even whether to charge at all," *see id.*, whereas in *Thomas*, the Court approved an ordinance that set forth specific grounds on which a permit application could be denied, *see* 534 U.S. at 324.

In the insurance context, courts have invariably rejected policies that gave public officials "unfettered discretion" over how much insurance coverage to require. *See, e.g., Coe*, 567 F. Supp. 2d at 563; *Nationalist Movement v. City of York*, 425 F. Supp. 2d 574, 583-85 (M.D. Pa. 2006), *overturned on other grounds*, 481 F.3d 178 (3d Cir. 2007); *Houston Peace Coalition*, 310 F. Supp. at 462; *Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 339. A policy that gives significant, unguided discretion over whether to require insurance in the first place will also run afoul of the First Amendment. *See Long Beach Lesbian & Gay Pride*, 14 Cal. App. 4th at 339 (explaining that a provision allowing the city manager to waive the insurance requirement if

he perceives no significant liability exposure was "suspect" because there were no objective criteria cabining the discretionary judgment).

Unlike some of the other issues we have discussed, however, this problem is relatively simple to solve. A hypothetical insurance requirement could pass this hurdle by requiring the same amount of insurance for all speakers (with waiver provisions for indigents or other specific categories of permit applicants as needed) or by implementing a set of objective, content-neutral criteria for determining when insurance is needed or how much coverage is necessary. Although we are reluctant to suggest specific criteria because we lack the requisite expertise in gauging risk for events on public roads, such criteria might reasonably include, for instance, the size of the event or the facilities required for the event. *See Thomas*, 227 F.3d at 925.

The government must also make sure that any waiver provisions are based on adequate and content-neutral standards. We recognize that there is some tension between our suggestion that certain exceptions and waiver provisions may help an insurance requirement survive review and our advice that too much discretion will doom an insurance requirement. Providing an exception to an insurance requirement where there is a limited risk of injury, for example, makes it more likely that the requirement will be narrowly tailored, but it might also vest too much discretion in the official charged with making that risk assessment. Nonetheless, we think it is possible to craft standards with objective criteria that would pass muster while allowing for waivers and exceptions as necessary. *See iMatter Utah*, 2013 U.S. Dist. LEXIS 158371, at *69-70 (concluding that Utah could formulate an exception for indigent applicants "without delegating too much discretion to the permitting officials"). Although such individualized determinations obviously create a risk that government officials will "waive the permit requirements for some favored speakers, while insisting upon them for others . . . this abuse must be dealt with if and when a pattern of unlawful favoritism appears, rather than by insisting upon a degree of rigidity that is found in few legal arrangements." *Thomas*, 534 U.S. at 325. Therefore, while governments must be careful to avoid unbridled discretion, this element should not be an obstacle to a successful insurance requirement.

### e.    Summary

In sum, insurance requirements are not clearly unconstitutional, but we cannot say that any particular insurance requirement that burdens expressive activity will be upheld. If a court finds that all insurance requirements are inherently content-based, for example, relatively little can be done to *ensure* that the policy is constitutional; there are no safe harbors here. A policy could theoretically exempt all expressive activity in an effort to survive a facial challenge to its constitutionality, but that would render the insurance requirement largely ineffective and could create new challenges for governments in deciding which events involve expressive activity. There are a number of steps, however, that would increase the probability that such a requirement will survive constitutional scrutiny. A government should probably include waiver provisions for indigents and other groups that have been unable to obtain insurance in the private market. And a government may also want to consider creating an exception for events with limited risks or crafting an insurance requirement that applies only to events when there are significant risks and a greater need for insurance. If a government takes either approach, however, it must ensure that the criteria for making those determinations are content-neutral and contain adequate standards to guide the administrator's discretion. Finally, SHA or a local government could adopt a non-mandatory insurance policy along the lines of the ones upheld by the Ninth Circuit in *Long Beach Area Peace Network* and *Food Not Bombs*. These suggestions are not exhaustive, and, ultimately, a court might well uphold an insurance requirement without them. But, in light of existing precedent that views insurance requirements somewhat skeptically, governments would be wise to take these issues into consideration when developing a policy.

### f.    Constitutionality of Insurance Requirements That Apply Only to Major Highways

As a final note, an insurance requirement for special events on Maryland roadways might also stand a better chance of success if it applied only to *major* highways (such as interstates, expressways, and large controlled access highways) rather than all roads. As the Supreme Court has explained, the standard of review under the First Amendment depends in part on the nature of the public property to which a restriction on speech applies. *See*, *e.g.*, *Perry*, 460 U.S. at 44. The Court has divided public property into three classes: (1) traditional public forums, which are places that "by long tradition or by government fiat have been devoted to assembly and debate," such as streets, sidewalks, and

parks; (2) designated public forums, which the government creates by "intentionally opening a nontraditional forum for public discourse"; and (3) non-public forums, which include other types of government property. *Child Evangelism Fellowship of Md. v. Montgomery County Pub. Sch.*, 457 F.3d 376, 381-82 (4th Cir. 2006) (internal quotations omitted).[27]

Non-public forums are typically characterized by "selective access" policies in which "individual, non-ministerial judgments" determine whether speech activities are permitted. *Id.* at 381 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998)). Examples include military installations and prisons. *See Greer v. Spock*, 424 U.S. 828, 836 (1976); *Adderley v. Florida*, 385 U.S. 39, 47-48 (1966). In general, a forum will be classified as non-public where "opening [it] to expressive conduct will somehow interfere with the objective use and purpose to which the property has been dedicated." *Warren v. Fairfax County*, 196 F.3d 186, 192-93 (1999) (en banc).

Unlike in public forums, a restriction on speech in a non-public forum is permissible so long as it is reasonable in light of the purpose of the forum, does not discriminate based on the speaker's viewpoint, and does not provide administrators with unbridled discretion. *Child Evangelism*, 457 F.3d at 383, 386-87. Although an insurance requirement in a non-public forum would still have to be viewpoint neutral and include adequate standards to cabin administrator discretion, it need only be "reasonable" rather than "narrowly tailored to a significant government interest." *Id.* at 383. Therefore, if a court classified a major highway as a non-public forum, an insurance requirement applying only to major highways would be reviewed under a more deferential standard.

---

[27] The Fourth Circuit in *Child Evangelism* recognized a fourth category, which it called a "limited public forum." 457 F.3d at 382. Like a designated public forum, a limited forum has been intentionally opened to the public. *Id.* But, while a designated forum has been made "generally accessible" to all speakers, a limited forum has only been opened for "a specific or limited type of expression." *Id.* In a limited forum the government "may be justified in reserving [its forum] for certain groups or for the discussion of certain topics," but in a designated forum, the government is subject to the same limitations as those in a traditional public forum. *Id.* (internal quotations and citations omitted).

As far as we can tell, no court has definitively determined whether a major highway is a public or non-public forum. The Supreme Court has explained that "all public streets are held in the public trust and are properly considered traditional public fora" and that "[n]o particularized inquiry into the precise nature of a specific street is necessary." *Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (rejecting contention that residential city streets were entitled to less protection than main city streets). But, although major highways are similar to streets in many ways, they are not necessarily "streets" in the same way as the Court used the term in *Frisby*. Unlike other traditional public forums, for example, major highways have not "by long tradition" been "devoted to assembly and debate." *Perry*, 460 U.S. at 45.

Rather, interstate highways and the like are "relatively modern creations" intended to allow "traffic to flow over long distances without the many interruptions occasioned by speed reductions through towns, villages and smaller cities." *Sentinel Communications Co. v. Watts*, 936 F.2d 1189, 1203 (11th Cir. 1991) (concluding that rest stops on interstate highways are not public forums). Opening them to expressive conduct would significantly interfere with the objective use and purpose to which these thoroughfares have been dedicated. *See Warren*, 196 F.3d at 192-93. Indeed, the General Assembly has apparently recognized that opening controlled access highways to "parades" and similar events would undermine the purposes of those highways. *See* TR § 21-313(a) (allowing SHA and localities to "prohibit the use of any controlled access highway in its jurisdiction by parades, low speed vehicles, funeral processions, bicycles, or other nonmotorized traffic or by any person operating a motorcycle"); *see also* TR §§ 21-509 (generally prohibiting pedestrians on controlled access highways); 21-1205.1 (restricting the operation of bicycles on expressways, signed controlled access highways, and other high speed roadways); 21-1405 (prohibiting pedestrians and bicycles on toll highways and other toll facilities administered by the Maryland Transportation Authority).

For these reasons, "while Main Street in a small town may be a traditional public forum, an interstate highway might not be one." *Warren*, 196 F.3d at 201 (Niemeyer, J., dissenting); *see also* Ronald J. Krotoszynski, Jr., *Celebrating Selma: The Importance of Context in Public Forum Analysis*, 104 Yale L.J. 1411, 1421 (1995) (reasoning that "[u]nder the existing analytical framework, a major highway would undoubtedly be classified as a 'nonpublic forum'" because "[h]eavily trafficked highways exist

principally to facilitate travel and commerce, not speech activities"). It is therefore possible that a court would classify a major highway as a non-public forum and subject any applicable speech restrictions to a less strict reasonableness test. Accordingly, limiting an insurance requirement to major highways—though certainly not required—might also increase the likelihood that such a requirement would be upheld.

## III

### Conclusion

For the reasons discussed above, we conclude that police officers can operate in "emergency status" and disregard the normal rules of an open road when providing escorts for large-scale motorcycle charity rides. We also find that local police officers can participate in motorcades that cross jurisdictional boundaries and, when doing so, can take certain actions necessary to perform and return from the escort duty, but they cannot make arrests or issue citations for violations of the traffic laws. Finally, SHA and local governments can impose insurance requirements for special events on roads under their control, but the State and localities must be aware that such insurance requirements—to the extent that they apply to expressive activities—are suspect under the First Amendment. Governments should therefore consider crafting policies that are less likely to restrict constitutionally-protected expressive rights.

Douglas F. Gansler
Attorney General of Maryland

Patrick B. Hughes
Assistant Attorney General

Adam D. Snyder
Chief Counsel, Opinions & Advice

* Mark H. Bowen, Assistant Attorney General, contributed significantly to the preparation of this opinion.